**Octavio P. GOMEZ, Plaintiff-Appellee (84–1651/1827) Cross-Appellant (84–1853),**

v.

**GREAT LAKES STEEL DIVISION NATIONAL STEEL CORPORATION, Defendant-Appellant (84–1651/1827) Cross-Appellee (84–1853).**

Nos. 84–1651, 84–1827 and 84–1853.

United States Court of Appeals,
Sixth Circuit.

Argued March 7, 1986.

Decided Oct. 10, 1986.

D. James Barton, Grosse Ile, Mich., Carl Hellerstedt (argued), for defendant-appellant cross-appellee.

Mayer Morganroth (argued), Southfield, Mich., Daniel J. Wright, Detroit, Mich., for plaintiff-appellee cross-appellant.

Before MERRITT and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

Defendant Great Lakes Steel Division, National Steel Corporation ("Great Lakes") appeals from the final judgment entered October 30, 1984, by the district court on a jury verdict in favor of plaintiff Octavio Gomez, and Gomez appeals from an order of remittitur. Gomez alleged that Great Lakes discriminated against him because of his Mexican-American heritage by failing to promote him, designating him for layoff, and constructively discharging him in violation of 42 U.S.C. § 1981 and the Michigan Elliott-Larsen Civil Rights Act, Mich.Comp. Laws § 37.2101 *et seq.* For reasons stated herein, we vacate the judgment of the district court and remand this case for a new trial.

## I.

In 1948 Great Lakes, a steel production facility, hired Gomez as an hourly employee in its open hearth and mold yards. In 1958 Gomez received a promotion to turn foreman in the No. 2 basic oxygen process (BOP) mold yard. "Turn foreman" is a first level management position which involves supervision of hourly employees who work rotating work shifts or turns. At trial Gomez testified that he thought Great Lakes also promoted him in December 1977 to general mold yard foreman for No. 2 BOP. Gomez believed that the job was a promotion, because it was not represented as temporary and because it was a vacancy created by the transfer of the general mold yard foreman to another area. However, Gomez alleged that he learned he was mistaken two months later when the assistant superintendent, Mr. Spuwell, said, "Good morning. How is my acting general mold yard foreman doing?" Gomez testified that he replied, "What do you mean 'acting'? Isn't this a permanent job?" Spuwell allegedly said, "No, not yet," and Adams, the supervisor, later said that Great Lakes was not sure what it was going to do with the job.

Gomez continued in this position until June 1980 when Mr. Wessells informed Gomez that he was being returned to turn

foreman as part of a personnel reassignment necessitated by the closing of No. 1 BOP. Ron Crosby, the caucasian general mold yard foreman from No. 1 BOP, replaced Gomez. Gomez testified that he had tried previously to "bump" from No. 2 BOP to No. 1 BOP, but that he was told it was not allowed. Gomez testified that when he asked Wessells why Crosby was permitted to "bump" when he was not, Wessells replied, "Well, that's the way it is." Gomez also testified that he believed his replacement by Crosby was discriminatory because Crosby had fewer years of service with Great Lakes and Crosby's 1979 performance appraisal was no better than that given Gomez.

On August 19, 1980, Crosby, who was Gomez's supervisor by virtue of the reassignment, told Gomez that it was his turn to be laid off as part of a rotational layoff due to economic conditions. When Gomez protested that men with less seniority than he were not laid off, Crosby responded that the company did not recognize supervisory seniority. Gomez testified that it suddenly came to him that he was a victim of discrimination. As a result, Gomez chose that same day to take early retirement to be effective August 21, 1980, and filed this action on July 6, 1981.

Gomez also presented evidence at trial that over the entire course of his career he was invited to attend only two one-hour training classes given by Great Lakes whereas other similarly situated employees were selected to attend many more classes. Gomez testified that supervisors never adequately answered his questions about not being selected for the classes which were unposted and by invitation only. Similarly, Gomez alleged that beginning in 1960 he started asking various supervisors for promotions and why he was not promoted. Gomez testified that over the years supervisors only generally answered that they were glad he was interested and that they would get back to him, but never did. Gomez identified four positions in particular for which he believed he was qualified: three openings that occurred in the mid–1960's for assistant general foreman and

general foreman, which were filled by caucasians, and in 1977 a general foreman position in the continuous caster division which was filled by a caucasian employee, John Deuve. It was Deuve's transfer to this job which created the vacancy for No. 2 BOP general foreman which Gomez filled on an acting basis until replaced by Crosby in 1980.

Great Lakes conceded that it lacked objective guidelines or policies for determining promotions, job assignments, and training class assignments. However, it denied that its actions toward Gomez were motivated by discrimination. With regard to promotions Great Lakes presented testimony that length of service was not a significant factor, that many caucasian hourly employees with more years of service than Gomez were never promoted, and that many caucasian turn foremen were not promoted further. As to the layoff Great Lakes presented evidence that ten caucasian turn foremen had been placed on layoff before Gomez and that length of service was not a relevant factor in designating layoffs. Great Lakes further explained that it had designated Gomez as "acting" general foreman instead of promoting him to general foreman because activity at No. 2 BOP had decreased due to newer caster processes, No. 2 BOP was being phased out, and because Crosby retained responsibility for overall planning and purchases for both No. 1 and 2 BOP. Great Lakes presented testimony that Gomez should have known at the onset that the position was not a promotion because the job was not affirmatively represented as a promotion and Gomez did not receive a pay increase. Finally, with regard to the training courses Great Lakes introduced testimony that many courses were not available until 1979 when it established a training department and that some courses were designed for new supervisors, not experienced supervisors like Gomez.

Great Lakes moved for a directed verdict with regard to the claims of discrimination which occurred prior to July 6, 1978, on the basis that the applicable three-year statute

of limitations barred them. The district court denied the motion finding that there was sufficient evidence to permit the jury to consider whether Great Lakes fraudulently concealed Gomez's cause of action which under Mich.Comp.Laws § 600.5855 would toll the statute of limitations.

The jury awarded Gomez $300,000.00 in economic loss, $500,000.00 in compensatory damages for mental anguish, and $1,500,000.00 in punitive damages plus prejudgment interest of $963,000.00 for a total of $3,263,000.00. In awarding damages which covered virtually Gomez's entire career the jury clearly found fraudulent concealment and did not limit its consideration to events occurring after July 6, 1978. Great Lakes moved for judgment notwithstanding the verdict alleging that insufficient evidence existed from which the jury could have found fraudulent concealment. Great Lakes also moved for a new trial or remittitur on the basis that the damages awarded were excessive and the result of prejudice. The district court denied the motion for judgment NOV, but granted remittitur to the extent of reducing compensatory damages to $150,000.00, reducing punitive damages to $300,000.00, and reducing the amount of prejudgment interest included in the award.

On appeal Great Lakes claims that the evidence was insufficient to support either the verdict of discrimination or the findings of fraudulent concealment and constructive discharge. Great Lakes also asserts that admission of Gomez's economic damage exhibit constituted reversible error, and that the punitive and compensatory damages were excessive and unsupported by substantial evidence. Gomez cross-appeals, arguing that the district court abused its discretion in granting remittitur in light of the evidence introduced at trial.

## II.

Although both parties have extensively argued the sufficiency or insufficiency of the evidence to sustain the verdict of national origin discrimination, our review of this issue is rendered unnecessary, and indeed would be meaningless, in light of several critical flaws in the trial which render the verdict unreliable and necessitate a remand for a new trial.

We turn first to the issue of sufficiency of evidence to support a finding of fraudulent concealment. Pursuant to Mich.Comp. Laws § 600.5805(8) a three-year statute of limitations ordinarily applies to claims under the Elliott-Larsen Act, *Mair v. Consumers Power Co.*, 419 Mich. 74, 77–78, 348 N.W.2d 256, 257–58 (1984), as well as to § 1981 civil rights actions, *Marlowe v. Fisher Body*, 489 F.2d 1057, 1063 (6th Cir. 1973). In this case Gomez's claims of discrimination which occurred prior to July 6, 1978, would thus be barred. However, Gomez alleged that the three-year limitations period was tolled due to Great Lakes' fraudulent concealment of his claim. According to Mich.Comp.Laws § 600.5855:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Gomez argues on appeal that there was sufficient evidence from which the jury could reasonably infer and find fraudulent concealment. Gomez asserts that various managers' promises to investigate his stated concerns about his lack of promotion and their subsequent failure to do so were acts designed to mislead him about Great Lakes' true motives in failing to promote him. He also charges that his transfer to acting general mold yard foreman was an "illusory promotion." Finally, in the words of Gomez's brief, the events of June and July 1980 involving his reassignment to turn foreman and layoff "caused him to understand what he had not understood

before," i.e., that he had been a victim of career-long discrimination. Great Lakes, however, contends that insufficient evidence existed from which a jury could find fraudulent concealment of Gomez's claim. The essence of Great Lakes' argument is that its failure to explain its actions (or inaction) to Gomez, in the absence of affirmative and fraudulent misrepresentations which concealed the existence of Gomez's cause of action, does not rise to fraudulent concealment. The district court acknowledged that this was "a relatively close issue," but concluded that Gomez had put forth sufficient evidence of fraudulent concealment and that the jury's finding of fraudulent concealment should not be overturned. We disagree.

In determining whether there is sufficient evidence to raise a question of fact for the jury and defeat a motion for directed verdict or judgment NOV, the trial court must view the evidence in a light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in the non-movant's favor. The trial court may neither weigh the evidence nor pass on credibility of witnesses, and cannot grant the motion unless the evidence is such that reasonable minds could come to but one conclusion as to the proper verdict. This court is bound by the same standard when reviewing the trial court's denial or grant of such motions. *National Polymer Products, Inc. v. Borg-Warner Corp.*, 660 F.2d 171, 177–78 (6th Cir.1981); *Coffy v. Multi-County Narcotics Bureau*, 600 F.2d 570, 579 (6th Cir.1979). In closely examining the record we find that there was insufficient evidence to support a finding of fraudulent concealment within the meaning of Mich.Comp.Laws § 600.5855.

■ In *DeHaan v. Winter*, 258 Mich. 293, 296, 241 N.W. 923, 924 (1932), the Michigan Supreme Court defined fraudulent concealment as follows:

Fraudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action. The acts relied on must be of an affirmative character and fraudulent.

A critical distinction is that Mich.Comp. Laws § 600.5855 concerns fraudulent concealment of the *cause of action*, as opposed to non-disclosure of *facts* or *evidence* which support the claim. As stated in *Eschenbacher v. Hier*, 363 Mich. 676, 682, 110 N.W.2d 731, 733 (1961):

It is not necessary that a party should know the details of the evidence by which to establish his cause of action. It is enough that he knows [or should know] that a cause of action exists in his favor, and when he has this knowledge, it is his own fault if he does not avail himself of those means which the law provides for prosecuting or preserving his claim.

*See also Echols v. Chrysler Corp.*, 633 F.2d 722, 725 (6th Cir.1980); *Hansen v. Upper Peninsula Power Co.*, 144 Mich. App. 138, 141, 373 N.W.2d 270, 271 (1985). It is clear that mere silence or inaction does not constitute fraudulent concealment. *Schram v. Burt*, 111 F.2d 557, 563 (6th Cir.1940); *Grebner v. Runyon*, 132 Mich. App. 327, 340, 347 N.W.2d 741, 747 (1984).

■ A review of Gomez's testimony reveals that he knew or should have known of a potential cause of action for alleged employment discrimination. Gomez testified that as early as 1960 he began asking various supervisors about promotions. In 1960 he twice directed such questions to a general pit foreman, Sievert, who said he was glad Gomez was interested and would see what he could do. From 1961 through 1963 Gomez repeatedly asked Sievert's successor, Clem Green, about promotions; Green allegedly said he would think about it or didn't know anything about it. Gomez testified that he asked Mr. Barton, an industrial relations manager, in 1971 about his lack of promotion. Barton allegedly referred Gomez to a personnel official, Mr. Ledbetter. Ledbetter allegedly told Gomez that he could see nothing wrong with his record and that he would look further into it. When Gomez heard nothing further, he

allegedly asked Ledbetter again, and Ledbetter responded that he had not yet had time to look into it. Gomez also talked to Ledbetter's successor, Mr. Olsen, who looked over Gomez's record and found nothing wrong with it. In 1974 Gomez asked Bruce Ramage, the plant's general manager, about his lack of promotion. Ramage allegedly said he would look into it, but never got back to Gomez. Gomez testified that in the early and mid–1970's he also asked Crosby and several other managers about his lack of promotion. All allegedly pleaded ignorance or said they would look into it and then did not respond further. In addition, Gomez testified in detail as to his knowledge of promotions for which he felt qualified and for which he was bypassed in the 1960's and 1970's; he also was able to identify the employees who received them (all caucasian with one exception and many with less tenure). Thus, Gomez clearly knew that promotions were given to other employees and that he had not been promoted despite repeated inquiries and at least two managers' admissions in the early 1970's that they could see nothing in his record which would hold him back. The same is true with regard to Gomez's inquiries about training classes and his knowledge that many others, but not he, were selected to attend them.

Gomez's potential cause of action—alleged discrimination due to lack of promotion and training—was never concealed and should have been apparent to him by reason of his feeling unfairly bypassed for promotions and training for which he believed himself qualified and for which he could find no apparent reason. Perhaps a case for fraudulent concealment could have been made had Great Lakes actively misled Gomez by fabricating reasons for his lack of promotion, but such is not the case. Despite all of Gomez's allegations that Great Lakes' conduct was affirmative and fraudulent, at the core his argument in the brief and at oral argument has been that Great Lakes never admitted to Gomez its alleged motivation of discrimination in not promoting him. It must be kept in mind that the essential element in stating a cause for fraudulent concealment is concealment of the *existence* of the claim, as contrasted with concealment of the evidence necessary to prove such a claim. Gomez's argument falls in the latter category. Finally, Gomez's argument seeks a *per se* rule that once an allegedly discriminatory act occurs and the employer fails to admit to the employee that the act was founded in discrimination, fraudulent concealment has occurred. Adoption of such a rule would effectively read the statute of limitations out of employment discrimination actions. We conclude that there was insufficient evidence and, indeed, a total lack of evidence, from which a finding of fraudulent concealment could be made. The district court erred in allowing claims of discrimination which occurred prior to July 6, 1978. Because the amount of damages awarded clearly reflects a jury finding of liability for virtually all alleged acts of discrimination occurring throughout Gomez's career, most of which are time-barred by our disposition of the fraudulent concealment claim, and because it is impossible to determine precisely what portion of the damages were awarded for the time-barred claims, a reversal and remand for a new trial is necessary.

### III.

Great Lakes also urges that there was insufficient evidence to support the finding of constructive discharge implicit in the jury's verdict and damage award. Gomez, however, asserts that he never raised this issue at trial, that Great Lakes failed to argue it, and that the judge never instructed on constructive discharge, so that the issue cannot now be raised on appeal.

Although Gomez never used the phrase "constructive discharge," the issue of constructive discharge was in fact tried. Gomez's complaint alleged that he "at 57 years of age was forced into early retirement, by virtue of Defendant's improper actions of replacing him by a younger caucasian and laying Plaintiff off." Gomez's testimony at trial was replete with representations that he felt compelled to retire

as a direct consequence of the rotational layoff and lack of promotions which he perceived to be discriminatory. Moreover, Gomez's evidence of damages was directed to the differential between his current income and what he would have received had he been in a job comparable to Crosby's until normal retirement age, the reduced amount of his pension due to early retirement, and the mental anguish resulting from his financial difficulties which ensued after his early retirement. Also Gomez's Exhibit No. 5, a chart of his economic damages, set forth a category for "Net Damages *Since Discharge....*" (emphasis added)

Despite the significant amount of evidence and testimony introduced regarding Gomez's alleged forced retirement or constructive discharge and the damages resulting therefrom, neither party requested a jury instruction on the elements necessary to establish constructive discharge. Although Great Lakes requested and received a general instruction on Gomez's duty to use ordinary care to minimize his damages after he had been injured, this instruction did not cure the plain error in the subsequent instruction on damages which can be read (and was perhaps understood by jurors) to assume that constructive discharge had been proven or that a finding of discrimination in itself entitled Gomez to terminate his employment and receive damages for injuries arising from the consequences of his early retirement. The disturbing portion of the instruction is as follows:

> You should include each of the following elements of damage which you say has been sustained by the Plaintiff to the present time: (a) wages and fringe benefits, less any wages and fringe benefits he has earned or should have earned through suitable ultimate employment; (b) the loss of difference between the pension received and the pension Plaintiff would have received had he retired at a later date, *if you find that Plaintiff would have retired at a later date but for Defendant's discrimination;* (c) damages for mental anguish, including

depression, denial of social pleasure and enjoyment and embarrassment, humiliation or mortification.

> You should also include each of such elements of damage which you decide the Plaintiff is reasonably certain to sustain in the future. If any element of damage is of a continuing nature, you shall decide how long it may continue. If an element of damage is permanent in nature, then you shall decide how long the Plaintiff is likely to live. (emphasis added)

Contrary to the clear implication of this instruction, in this circuit:

> [A] finding of constructive discharge requires the determination that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' *Geisler v. Folsom*, 735 F.2d 991, 996 (6th Cir.1984) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982).

*Williams v. Caterpillar Tractor Co.*, 770 F.2d 47, 49 (6th Cir.1985).

 Ordinarily the appellant's failure to object to the trial court's instructions precludes appellate review of the alleged error. However, appellate courts retain the discretion to review errors not preserved for appeal in those exceptional cases where the errors are so obvious and prejudicial as to affect the fairness of judicial proceedings. *Rodgers v. Fisher Body Division, General Motors Corp.*, 739 F.2d 1102, 1106 (6th Cir.1984); *Batesole v. Stratford*, 505 F.2d 804, 807–08 (6th Cir. 1974). We believe that this is such a case. If there was no actionable constructive discharge, Gomez cannot recover for those losses directly attributable to his voluntary decision to retire. Absent constructive discharge Gomez had a duty to mitigate his damages by remaining on the job. *See Leonard v. City of Frankfort Electric and Water Plant Board*, 752 F.2d 189, 195 (6th Cir.1985) (citing *Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614 (6th Cir.1983), *cert. denied*, 466 U.S. 950,

104 S.Ct. 2151, 80 L.Ed.2d 537 (1984)); *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 66 (5th Cir.1980); *Adler v. John Carroll University*, 549 F.Supp. 652, 655–56 (N.D.Ohio 1982). Inasmuch as the jury awarded $300,000 of the $311,390 requested by Gomez for economic loss in Plaintiff's Exhibit 5, which assigned $233,-185 of the loss to damages incurred "since discharge," the damages awarded reflected a finding of constructive discharge. Undoubtedly, the instruction also affected the jury's determination of punitive damages and damages for mental anguish. This is thus "a case where the jury, having been provided inadequate guidance, lost its way in its attempt to determine just and reasonable damages awards." *Rodgers*, 739 F.2d at 1104. In sum, the failure of the district court to instruct the jury adequately on the issue of constructive discharge, which was litigated and critical to the amount of damages available to Gomez, seriously affected the fairness of the proceedings and necessitates a remand for a new trial so that, with the benefit of proper instructions, the jury can determine on the facts whether a constructive discharge occurred and, if so, what damages flowed therefrom.

## IV.

■ Great Lakes has also challenged the admission in evidence of Gomez's Exhibit No. 5 entitled "Summary of Actual Damages." When confronted at trial with this exhibit which it had not previously seen, Great Lakes objected that the exhibit misrepresented damages, and that it was illustrative and appropriate only for final argument, and not as evidence. The district court overruled the objection, stating that Great Lakes could introduce its own version of the summary. Although not specifically cited by appellant or the district court, Fed.R.Evid. 1006 was presumably the provision under which Exhibit No. 5 was admitted. Rule 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

The admission of summaries under Rule 1006 is committed to the sound discretion of the trial court. *United States v. Collins*, 596 F.2d 166, 169 (6th Cir.1979). On appeal Great Lakes urges that Exhibit No. 5 was seriously flawed due to the manner in which Gomez's overtime wages were included in the back pay calculation; Great Lakes also charges that the chart of Gomez's future economic loss was unsupported by evidence and was speculative since Crosby, upon whose wages and status the chart was based, was permanently laid off in 1982 when his position was abolished.

■ We agree with Great Lakes that Exhibit No. 5 was improperly admitted, but for reasons more implicit in Great Lakes' argument than expressly articulated. Contents of charts or summaries admitted as evidence under Rule 1006 must fairly represent and be taken from underlying documentary proof which is too voluminous for convenient in-court examination, and they must be accurate and nonprejudicial. *United States v. Scales*, 594 F.2d 558, 561–63 (6th Cir.), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979). *See generally* 5 J. Weinstein and M. Berger, *Weinstein's Evidence*, ¶ 1006[1]–[07] (1986). Such summaries or charts admitted *as evidence* under Rule 1006 are to be distinguished from summaries or charts used as pedagogical devices which organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence. *Scales*, 594 F.2d at 563–64; J. Weinstein and M. Berger, *supra*, at ¶ 1006[07]. Such pedagogical devices "are more akin to argument than evidence.... Quite often they are used on summation." J. Weinstein and M. Berger, *supra*, at ¶ 1006[07]. Generally, such a summary is, and should be, accompanied by a limiting instruction which informs the jury of the summary's purpose and that it does not

itself constitute evidence. *See United States v. Seelig,* 622 F.2d 207, 214 (6th Cir.1980); *Scales,* 594 F.2d at 564.

Gomez in his appellate brief acknowledged that the exhibit was offered "in order to aid the court and jury in understanding his theory of economic damages ..." and argued that it was proper to allow "plaintiff to arrange the figures and argue from them as he wanted...." The record also reflects that, upon perusing Exhibit No. 5, the district court judge noted that it was "used principally for the purpose of argument." Gomez used Exhibit No. 5 extensively in his closing argument. Moreover, Exhibit No. 5, despite its heading of "Summary of Actual Damages" projected future events and economic losses, and was therefore not a simple compilation of voluminous records. *See State Office Systems, Inc. v. Olivetti Corp. of America,* 762 F.2d 843, 845–46 (10th Cir.1985). Finally, its subheading, "Net Damages *Since Discharge* After Deduction of $825.00 Per Month Pension," assumed the unproven fact of constructive discharge. We conclude that the district court abused its discretion in admitting Exhibit No. 5 without limiting instructions explaining the exhibit's nature and purpose.

## V.

Given the necessity of remand and a new trial due to our disposition of the above issues, we need not address the arguments raised by both parties regarding the remittitur.

The judgment of the district court entered upon the jury verdict is hereby vacated, and the case is remanded for a new trial and proceedings consistent with this opinion.