UNITED STATES of America,
Plaintiff–Appellee,

v.

Doyle E. CAMPBELL, Doyle E. Campbell, M.D., Inc., an Ohio corporation, Defendants–Appellants.

No. 87–3466.

United States Court of Appeals,
Sixth Circuit.

Decided April 12, 1988.

Thomas M. Tyack, argued, Thomas M. Tyack & Assoc. Co., Columbus, Ohio, for defendants-appellants.

Ann Marie Tracey, argued, Asst. U.S. Atty., Cincinnati, Ohio, for plaintiff-appellee.

Before MARTIN, GUY, and BOGGS, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

On November 20, 1986, Dr. Doyle E. Campbell and his corporate alter-ego, Dr. Doyle E. Campbell, M.D., Inc., were charged in a multi-count indictment alleging that Dr. Campbell had billed for treatments he either did not perform or were unnecessary. Counts 1 through 45 charged each defendant with mail fraud, in violation of 18 U.S.C. § 1341, based on checks received by Dr. Campbell from Nationwide Insurance Company. Counts 46 through 72 charged each defendant with filing false claims against the United States government, in violation of 18 U.S.C. § 287, based on claims submitted by Dr. Campbell. The indictment also alleged that the defendants had aided and abetted each other with respect to each individual count, in violation of 18 U.S.C. § 2. The defendants pled not guilty and were tried before a jury in federal court. The 72 counts of aiding and abetting were dismissed by the trial judge at the close of the government's case. Of the remaining 72 counts which went to the jury, the defendants were each found guilty of 34 mail fraud counts and 18 counts of false claims. In each case where the defendants were found guilty of submitting a false claim with respect to a particular patient, they were also convicted of the related count of mail fraud. Likewise, with respect to the 9 counts in which the defendants were found not guilty of filing false claims, they were also acquitted of the corresponding charge of mail fraud. Thus, of the 36 patients referred to in the indictment, the jury found defendants guilty of a total of 52 counts involving 25 patients and not guilty on 20 counts involving 11 patients.

On May 6, 1987, Dr. Campbell was sentenced to 14 months imprisonment on each count to run concurrent with each other and was fined $75,400. The corporate defendant received the same fine, with payment by either defendant to be credited against the other. For the following rea-

**1376**

sons, the defendants' convictions are affirmed.[1]

## I.

Dr. Doyle E. Campbell, an ophthalmologist, established his practice in southern Ohio in 1971. Many of Dr. Campbell's patients are elderly people who qualify for federal medicare benefits and state medicaid benefits. The Health Care Financing Administration (HCFA), a division of the Department of Health and Human Services, has contracted with Nationwide Insurance Company to administer the medicare claims in Ohio. Under the existing financing system, a doctor who treats a medicare patient is required to submit a "Medicare Health Insurance Claim Form" (HCFA form 1500) to Nationwide which, on behalf of HCFA, pays for a portion of the claim. The doctor is required to certify that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally rendered by me or were rendered incident to my professional service by my employees." (App.1357). This case arose as a result of claims filed by Dr. Campbell seeking reimbursement for laser treatments which he performed on several of his medicare patients. The claims ranged from $900 to $950 of which $530 to $680 were covered by the medicare program. The government alleged that Dr. Campbell billed medicare for several treatments which were either not performed or were not necessary.

Dr. Campbell purchased an Argon laser in 1983 to treat patients who suffer from glaucoma. Glaucoma is a medical condition generally defined as increased internal pressure within the eye which causes nerve damage and leads to gradual loss of sight. (App. 467–68). One of the government's expert witnesses, Dr. Zalta, testified that nerve damage and corresponding reduction in vision must be present in order to establish the existence of glaucoma. Dr. Zalta also stated that high internal eye pressure, or ocular hypertension, will not necessarily lead to nerve damage because the tolerance

for internal ocular pressure varies among individuals. The expert for the defense, Dr. Andrew, agreed with Dr. Zalta's general description; however, he also noted that some doctors define glaucoma in a broad sense to encompass all cases of elevated internal eye pressure. (App. 1045).

The laser can be used to treat glaucoma by placing small burns upon the trabecular meshwork which is the "drain" in the eye that permits fluids to leave the eye. This treatment is referred to as Argon Laser Trabeculoplasty (ALT). Initially, when the ALT procedure first became widely available, doctors were advised to administer 100 burns over a 360–degree radius of the eye at a maximum power setting of 1,000 milliwatts. Subsequent studies showed that effective results could be achieved with 40 to 100 burns at 600 to 1,000 milliwatts. All the expert witnesses, including the defense witness, Dr. Andrew, testified that these ranges represented the current standards of medical treatment. The doctors also agreed that glaucoma patients should be treated first with medications and eyedrops and that laser treatment should only be used if the maximum tolerated medicinal therapy proved ineffective. Defendant, however, cited a recent experimental study in which laser treatments are being used as an initial form of treatment. Dr. Weber, who appeared as an expert witness for the government, is currently participating in this study which will not be completed until 1989 at the earliest.

Dr. Campbell testified that he generally made 15 to 25 burns using a power setting of 300 milliwatts. His assistants testified that in most cases, Dr. Campbell only made 5 to 10 burns. Many of the patients testified that they received 5 or less "shots" based on the number of flashes and the distinctive "clicking" noise made by the machine when the laser was activated. Moreover, several of the patients testified that Dr. Campbell did not place a "gonioscopic lens" over their eye before the treatment. All the experts agreed that the use of such a lens was essential to effective laser treatment.

1. Both defendants are hereinafter referred to in the singular.

Defendant raises the following issues on appeal. First, defendant contends that the district court erred by allowing the government to present videotaped deposition testimony where the government had failed to establish that these witnesses were unavailable at the time of trial and that the depositions had been authenticated by the deponents. Second, defendant argues that the government should not have been allowed to call on two witnesses who were not mentioned in the indictment. The third argument relates to the admission of certain physical evidence including a check stub showing the cost of the ALT machine and a chart summarizing the patients' individual records. Finally, Dr. Campbell argues that he cannot be convicted of mail fraud and making false claims where he administered a recognized form of treatment for a patient's medical condition. We address these issues *seriatim.*

## II.

Dr. Campbell objects to the admission of the videotaped deposition testimony on several grounds.

### A. Unavailability

Defendant argues that the court erred in failing to require the government to show that the witnesses were unavailable to testify *at the time of trial.* On February 4, 1987, the government filed a motion to take the depositions of several elderly witnesses whose health-related problems prevented them from traveling to Cincinnati. The defendant did not object to the motion. In granting the government's motion, the district court stated:

Federal Rule of Criminal Procedure 15 provides that upon a showing of "exceptional circumstances" and "in the interest of justice," the Court may order the taking of testimony of prospective witnesses by deposition. This Court concludes that such exceptional circumstances have been shown in this case. It has been shown that the witnesses in question are all Medicare beneficiaries upon whom the defendant is alleged to have performed the Argon laser trabeculo-

plasty; also, it has been shown that these witnesses have severe difficulties which may prevent their testimony at the trial of this matter.

(App.24).

On February 20, 1987, the United States moved pursuant to Rule 15 of the Federal Rules of Criminal Procedure to use the depositions of several witnesses at trial based on the witnesses' unavailability under Rule 804(a) of the Federal Rules of Evidence. Defense counsel objected to the use of the depositions at trial, and after lengthy argument, the objection was overruled. (App.852–870).

Rule 15(a) and (e) of the Federal Rules of Criminal Procedure provides in part:

(a) When Taken. Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties, order that testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged, be produced at the same time and place....

. . . .

(e) Use. At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used as substantive evidence if the witness is unavailable, as unavailability is defined in Rule 804(a) of the Federal Rules of Evidence....

Fed.R.Crim.P. 15(a) and (e).

Federal Rule of Evidence 804(a) provides in part:

(a) Definition of Unavailability—"Unavailability as a witness" includes situations in which the declarant—

. . . .

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity....

Fed.R.Evid. 804(a)(4).

■ It is well established that the infirmity of an elderly witness which prevents

him or her from traveling is an "exceptional circumstance" which justifies the use of deposition testimony at trial. *United States v. Keithan,* 751 F.2d 9 (1st Cir. 1984). The determination of admissibility of deposition testimony based on the unavailability of the witness is a matter left to the discretion of the trial judge. *United States v. Acosta,* 769 F.2d 721 (11th Cir. 1985).

■ In the instant case, the judge made a specific determination that the witnesses were unable to travel to Cincinnati at the time he granted the government's motion to take the depositions on February 10, 1987. The trial commenced less than two weeks later. By admitting the depositions at trial, the district judge implicitly found that the exceptional circumstances which initially justified the taking of the depositions were still present since it was highly unlikely that an elderly invalid would undergo a miraculous rejuvenation during the two-week interval. Thus, we find that the district court did not abuse its discretion by admitting the deposition testimony without first conducting a special hearing to determine whether the witnesses were physically unable to appear in person at trial.

B. Authentication of Stenographic Depositions

Defendant also claims as error the court's admission into evidence of depositions that were not authenticated by the witnesses. Federal Rule of Criminal Procedure 15(d) states that "depositions shall be taken and filed in the manner provided in Civil Actions." Therefore, Rule 15 of the Federal Rules of Criminal Procedure incorporates Rule 30(e) of the Federal Rules of Civil Procedure which provides:

(e) Submission to Witness; Changes; Signing. When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by the witness, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer

with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign.

Fed.R.Civ.P. 30(e).

In the instant case, it is undisputed that the deponents did not review and sign the transcripts of their testimony. Prior to the taking of the first deposition, defense counsel stated for the record that "the defendant on this deposition or any other does not waive any of the requirements of the form with regard to the formality or authentication." (App.859). Thereafter, defense counsel never again raised the issue until the trial when he objected to the admission of the deposition into evidence. The assistant United States attorney admitted to the judge that she had been unaware of the signing requirement and she moved for a delay of trial to enable the government to retake the depositions. (App.862). The district court expressed its concern with the government's failure to comply with the proper authentication procedures (App. 868–69); nevertheless, the court overruled defendant's objection and allowed the deposition into evidence under Rule 2 of the Federal Rules of Criminal Procedure which provides:

Rule 2. Purpose and Construction

These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.

Fed.R.Crim.P. 2.

On appeal, the government contends that the defendant waived any objection based on a lack of authentication because defendant failed to file a motion to suppress under Rule 32(d)(4) which provides:

(4) As to Completion and Return of Deposition. Errors and irregularities in the manner in which the testimony is transcribed or the deposition is prepared, signed, certified, sealed, endorsed, transmitted, filed, or otherwise dealt with by the officer under Rules 30 and 31 are

waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained.

Fed.R.Civ.P. 32(d)(4).

In support of its argument, the government cites to the Ninth Circuit decision in *United States v. Garcia,* 527 F.2d 473 (9th Cir.1975), wherein the court held that defendant had waived his objection because he had not filed a motion to suppress as required by Rule 32(d)(4).

■ Regardless of whether or not defendant waived his objection in this case, we find that the admission of the unsigned depositions at most constitutes harmless error under Rule 52(a) of the Federal Rules of Criminal Procedure which states: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

First, we note that defendant has not cited any specific examples of possible inaccuracies in the deposition testimony. Nor has defendant demonstrated any prejudice which might have resulted from the failure of the deponents to review and sign the transcripts of their testimony. We note that defense counsel was present when the depositions were taken and therefore had an opportunity to point out any perceived irregularities or mistakes. Moreover, the depositions were videotaped and these tapes were shown to the jury at trial. The use of the videotapes is discussed in greater detail *infra,* but for purposes of the present issue, we note that the use of videotapes eliminates the risk of error resulting from typographical mistakes which occasionally occur during the course of stenographic transcription. Finally, we note that the jury may have relied on the evidence presented in the tapes and, therefore, the deponents' failure to sign the stenographic transcripts would be only remotely relevant to the accuracy of the taped testimony. Thus, we conclude that the lack of authentication of the transcripts amounts to no more than harmless error and does not provide a basis for reversal.

*See McVay v. Cincinnati Union Terminal Co.,* 416 F.2d 853 (6th Cir.1969).

### C. Use of Videotaped Depositions

Defendant claims that the district court erred by allowing the presentation of the deposition testimony to the jury in a videotape format. Defendant bases his argument on Fed.R.Civ.P. 30(b)(4) which is incorporated by reference into Fed.R.Crim.P. 15(d). Rule 30(b)(4) provides in part:

(4) The parties may stipulate in writing or the court may upon Motion order that the testimony at a deposition be recorded by other than stenographic means. The stipulation or order shall designate the person before whom the deposition shall be taken, the manner of recording, preserving and filing the deposition, and may include other provisions to assure that the recorded testimony will be accurate and trustworthy. A party may arrange to have a stenographic transcription made at the party's own expense.

Fed.R.Civ.P. 30(b)(4).

Defendant argues that the court order granting the government's request to take deposition testimony did not expressly allow the government to videotape those depositions. The defendant also notes that he never stipulated to the videorecording of the depositions. Moreover, defendant once again relies on the general statement of the defense counsel made at the outset of the depositions in which he states that defendant does not waive "any of the requirements of form with regard to formality and authentication." The assistant United States attorney was apparently caught off guard when defense counsel raised this objection at trial. The court declined her motion to have the videotaped format approved *nunc pro tunc;* nevertheless, the court overruled defendant's objection and allowed the tapes to be played before the jury.

■ We find that the government's failure to obtain special permission from the court to videotape the depositions constitutes no more than harmless error under Fed.R.Crim.P. 52(a). Once again, defendant has failed to demonstrate any prejudice

resulting from the presentation of the deposition testimony in the videotape format as opposed to the traditional stenographic record. We also note that defense counsel was present at all the depositions and never objected to the recording by means of videotape. It appears that defense counsel was "sandbagging" on this argument, waiting to spring it on the government at trial. Moreover, the district court allowed the use of the tapes even though it had not expressly authorized the taping of the depositions in its previous order. A review of the transcript shows that defense counsel did not raise any legitimate objections to the presentation of the videotaped testimony other than that the government had failed to get prior approval from the court. Defendant raises the same argument on appeal and relies solely on the alleged violation of Fed.R.Civ.P. 30(b)(4).

Under these circumstances, we find that the government's alleged failure to comply with the technical requirements of Rule 30(b)(4) in obtaining the videotaped testimony of the deposition witnesses prior to trial and the district court's subsequent ruling allowing the government to show the tapes at trial amounts to no more than harmless error.

## III.

Defendant contends that the trial court erred in admitting into evidence the testimony of two former patients of the defendant. Mary Newton testified that she was billed for a laser treatment which was never performed. According to Mrs. Newton, the bill was reduced by 50 percent after she complained to Dr. Campbell. The second witness was Jessie Marie Gammon, a former licensed practical nurse, who testified that defendant had told her that she had received laser treatment even though she saw no flashes. Neither Mrs. Newton nor Mrs. Gammon was mentioned in the indictment and defendant contends that their testimony was inadmissible under Federal Rule of Evidence 404(b), which provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

In *United States v. Vincent*, 681 F.2d 462 (6th Cir.1982), this court set forth the analysis to be used when reviewing the admissibility of evidence under Rule 404(b):

In reviewing the admission of evidence challenged under Rule 404(b), we must make two determinations. First, we must decide whether [the evidence] was admissible for any *proper* purpose, as distinct from the *improper* purpose of showing "character" or "propensity." If we conclude that there was a proper basis for admission, we must then consider whether the probative value of the evidence outweighed its potential prejudicial effects. In the second instance, the standard of review on appeal is whether the trial judge abused his discretion in admitting the evidence.

*Id.* at 465 (emphasis in original) (citations omitted) (quoted in *United States v. Dabish*, 708 F.2d 240, 242 (6th Cir.1983)).

■ Applying this two-step test, we find that the evidence was admissible for the purpose of showing "intent." The acts alleged were substantially similar and approximately concurrent with the offenses charged in the indictment. *See United States v. Largent*, 545 F.2d 1039 (6th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977). Moreover, the question of intent was clearly at issue since Dr. Campbell's primary defense was that he had acted in good faith, and both knowledge and intent are elements of those offenses under 18 U.S.C. §§ 287 and 1341. *See generally Dabish*, 708 F.2d 240 (similar acts are admissible to prove criminal intent).

We also find that the district court did not abuse its discretion in deciding that the probative value of the evidence outweighed its prejudicial effect. This evidence did not involve allegations of unrelated "bad acts"

which might impugn the character of the defendant. Rather, the testimony of Mrs. Newton and Mrs. Gammon paralleled that of many of the victims who were referenced in the indictment and was directly relevant to the issue of whether the defendant had knowingly engaged in a scheme to defraud his patients and their insurers by charging for unnecessary treatments.

## IV.

■ The defendant's claims of error with respect to the introduction of some of the physical evidence merits only brief discussion. Defendant claims that he was unduly prejudiced by the admission of two cancelled checks which showed that he paid over $50,000 for the laser machine. The government argues that this evidence is admissible to show motive since, under the government's theory of the case, defendant performed unnecessary and useless procedures in order to recoup the cost of the machine. We find that the trial judge did not abuse his discretion in determining that the probative value outweighed the prejudicial effect.

■ Defendant also claims that the court erred by allowing the government to introduce a summary chart based on defendant's medical files. The chart was prepared by one of the government's expert witnesses, Dr. Zalta, who summarized the information which appeared in the files of the patients who were named in the indictment. Defendant first contends that the chart was misleading and inaccurate. This contention is without merit.

Defendant also argues that the chart was unnecessary and, therefore, inadmissible because the jury could have examined the individual files themselves.

Federal Rule of Evidence 1006 provides in part:

[C]ontents of voluminous writings, recordings or photographs that cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.

The Sixth Circuit, in *United States v. Scales*, 594 F.2d 558 (6th Cir.), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979), recognized that summary charts are admissible not only under Rule 1006, but by the "established tradition" in the Sixth Circuit, and others, permitting introduction of summary evidence with a proper limiting instruction. *Id.* at 563. The records consisted of the patient files of 36 patients, containing a maximum of approximately 30 pages of information per patient. Without the chart, the jury would have been forced to review hundreds of pages of technical information which may not have been readily understandable to the lay reader. Moreover, the individual files were admitted into evidence and were available for examination by the jury if they so desired.

"The admission of summaries under Rule 1006 is committed to the sound discretion of the trial court." *Gomez v. Great Lakes Steel Division National Steel Corp.*, 803 F.2d 250, 257 (6th Cir.1986); *United States v. Collins*, 596 F.2d 166, 169 (6th Cir.1979). We find that the district court did not abuse its discretion in admitting the summary chart.

## V.

Defendant contends that the acts alleged in the indictment do not constitute crimes under the false claim statute, 18 U.S.C. § 287, or the mail fraud statute, 18 U.S.C. § 1341. We disagree.

Title 18 U.S.C. § 287 provides:

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

18 U.S.C. § 287 (Supp.1987).

■ In the instant case, defendant was charged with performing medical treatments that were unnecessary and inappropriate and then billing the government for the procedures. The medicare claim forms

expressly required the doctor to certify that "the services shown on this form were medically indicated and necessary for the health of the patient." Thus, where a physician submits a medicare claim to the government through an insurer, and the physician knows that the treatments performed were unnecessary or non-therapeutic, he or she is criminally liable under section 287. *See United States v. Catena*, 500 F.2d 1319 (3d Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 621, 42 L.Ed.2d 1641 (1974).

The mail fraud statute is contained in 18 U.S.C. § 1341 which provides in part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, ... any such matter or thing, [shall be punished according to law].....

In *United States v. Talbott*, 590 F.2d 192, 195 (6th Cir.1978), this court described the offense of mail fraud under section 1341:

The elements of the offense of mail fraud under 18 U.S.C. (Supp.V) § 1341 are (1) a scheme to defraud, and (2) a mailing for the purpose of executing same. "It is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). See also *United States v. Schilling*, 561 F.2d 659 (6th Cir.1977). Nor is it required that the false representations themselves were transmitted by mail. "It is sufficient that the use of the mails was caused by the defendant in furtherance of the fraudulent scheme." *United States v. Hopkins*, 357 F.2d 14, 17 (6th Cir.) *cert.*

*den.* 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed. 2d 84 (1966).

"Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States, supra*, 347 U.S. at 8–9, 74 S.Ct. at 363. See also *United States v. Street*, 529 F.2d 226 (6th Cir.1976). "That the confirmation letters and mailed check could have been hand-delivered or delivered otherwise than through the mails, is immaterial." *United States v. Stull*, 521 F.2d 687, 689 (6th Cir.1975) *cert. den.* 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976).

In *Talbott*, this court upheld the mail fraud convictions of two dentists who were charged with having billed a joint state and Federal Medicaid Program for dental examinations, services and treatments that were medically unnecessary or, if not, were performed unprofessionally and without regard for the patients' well being. Like Dr. Campbell, the defendants in *Talbott* argued that their conduct was at worst tortious malpractice and could not support a criminal conviction. This court rejected that argument and held that the defendants could lawfully be prosecuted for "wilfully devising a scheme or artifice to defraud [the government] through knowing misrepresentation of the type and nature of the treatments involved and the carrying out of such scheme by use of the mails in delivering the false billings." 590 F.2d at 195.

■ Dr. Campbell seeks support for his position from the Supreme Court's recent decision in *McNally v. United States*, 483 U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In *McNally*, the Court limited the scope of the mail fraud statute by overturning the conviction of a defendant who was accused of barring deprived citizens through a fraudulent scheme involving the mails of their right to "good government." Unlike the "intangible rights" involved in *McNally*, Dr. Campbell's conviction is based on a fraudulent scheme to obtain *money* from his patients and the govern-

ment. This type of conduct is clearly within the traditional parameters of the offense described in section 1341.

### VI.

Finally, we consider the issue of whether there was sufficient evidence to support the defendant's convictions under sections 287 and 1341. The determinative issue is whether the defendant acted with fraudulent intent which is a common element to both offenses. Our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

In the instant case, the government's expert witness, Dr. Zalta, testified that the commonly accepted definition of glaucoma involves actual nerve damage and partial loss of vision resulting from increased internal eye pressure. Dr. Zalta stated that increased eye pressure or ocular hypertension leads to vision loss in a relatively small percentage of cases. Therefore, according to Dr. Zalta, the current standard of medical practice calls for doctors to refrain from administering the available glaucoma treatment until the patient has suffered some loss of vision.

Once the patient has been diagnosed as having glaucoma, Dr. Zalta testified that a three-step process is used to treat the ailment. First, the patient is treated with eye drops or medication which is effective in 90 to 95 per cent of the cases, although it may also result in some minor side effects. If the medications fail to reduce the internal pressure, the next step would be to administer laser treatment. Finally, if all other forms of treatment proved ineffective, the doctor might attempt to reduce the internal eye pressure through conventional surgery. Dr. Zalta reviewed the records of the patients named in the indictment and testified that 27 of the 36 patients were not suffering from glaucoma at the time defendant administered the laser treatment. In addition, Dr.

Zalta testified that 18 of the patients had not received any medications prior to the laser treatment, and none of the remaining patients were on maximum tolerated medical therapy. In other words, the potential for successful treatment with medications had not been exhausted prior to the laser treatment.

The government also introduced evidence showing that the treatments administered by the defendant could not have been effective. All the expert witnesses testified that the current standard called for 40 to 100 burns at between 600 and 1,000 milliwatts. Defendant testified that he only performed 15 to 25 burns at 300 milliwatts. Defendant's assistants and patients testified that he only made 5 to 10 burns. Moreover, several patients testified that the defendant did not fit them with a gonioscopic lens which all the experts agreed was essential to the proper administration of the laser treatment. Based on this evidence, the jury could have inferred that the defendant intentionally used a small number of shots at a lower power setting because he knew the treatments were unnecessary and he did not want to risk the chance of permanent injury which is an inherent risk in the laser treatments.

When the evidence presented at trial is viewed most favorably to the government, we find that a rational trier of fact could have concluded that the doctor was not merely performing an experimental procedure, but rather knowingly administering unnecessary and ineffective treatments for which he then billed the government.

For the foregoing reasons, the defendant's conviction is AFFIRMED.

BOYCE F. MARTIN, Jr., Circuit Judge, dissenting.

I write separately to voice my disagreement with the majority's conclusions drawn in section III of its analysis. Specifically, I believe that the trial court erred when it admitted into evidence the testimony of two former patients of the defendant, two patients who were not listed in the indictment as defrauded by the defendant.

While I agree with the majority's reliance upon *United States v. Vincent*, 681 F.2d 462 (6th Cir.1982), where this court established the analysis to be used when reviewing the admissibility of evidence under Rule 404(b), I disagree with the majority's application of that analysis. Rule 404(b) provides:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action and conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

I do not see how the testimony of Mary Newton or Jessie Gammon can be admitted within the requirements of Rule 404(b). Mrs. Newton, who was not listed in the indictment as having been defrauded, testified at trial that the defendant did not perform any laser treatments on her and that the first time she knew she had received a laser treatment was when she received a $900 bill in the mail. She also testified that she complained about the bill and that the defendant then cut the bill in one-half. This testimony has no relevance to the question of whether the defendant possessed the intent necessary to be convicted of defrauding Medicare and the individuals listed in the indictment. It appears clear that the purpose of this testimony was to introduce evidence from which the jury could infer that the defendant was guilty of bad acts.

Mrs. Gammon, a second patient of the defendant not listed in the indictment, testified to the effect that the defendant did not use a "gonio lens" which is necessary to perform laser treatments. She was the only patient to allege that no lens was used. She was also allowed to testify that when she requested her charts from the defendant they could not be found and that she never did receive her medical records from the defendant. She was the only patient to testify that she could not obtain her records. Like the testimony of Mrs. Newton, this testimony has no relevance to the counts charged in the indictment. Because of the importance of the testimony of these two witnesses, owing to its uniqueness and dissimilarity from the other evidence in this case, I would find that the district court abused its discretion in admitting the extrinsic testimony of Gammon and Newton in contravention of Rule 404(b).

The majority indicates that it believes that the evidence is admissible for the purpose of showing "intent." The trial court indicated, at pages 297 and 298 of the transcript, that it was admitting the testimony of these two witnesses because it helped show "knowledge." It must be remembered, however, that "intent" and "knowledge" should not be analyzed in a vaccum but with respect to the crimes alleged to have been committed by the defendant in the indictment. The indictment indicates the identity of the defendant's patients alleged to have been defrauded and how the defendant, as part of that scheme, also defrauded the Department of Health and Human Services. Nowhere in the indictment is Mary Newton or Jessie Gammon identified. Thus, even if the defendant intended to defraud Newton and Gammon, I do not see how this is relevant to the government's allegations that the doctor intentionally defrauded Medicare and those patients identified in the indictment. The role that Newton's and Gammon's testimony played in convicting defendant cannot be minimized. In a colloquy with the trial court, the government's attorney admitted that Newton's testimony was critical because she was "the only witness ... that can testify that she personally was defrauded of money because she had to pay the bill herself." Indeed, Mrs. Newton was not a Medicare patient and was the only patient who testified that no surgical procedure was performed. All the patients listed in the indictment were Medicare patients and none of them testified that no laser procedure was performed. I believe the testimony of Mrs. Newton had nothing to do with the other counts in the indictment, and that it was, undoubtedly, highly prejudicial.

The wrongs committed by the defendant with respect to these two witnesses do not relate in any way to the charges made against the defendant in the indictment, except perhaps to indicate that a defendant who would perform these acts may be presumed to have intentionally defrauded the defendants in the indictment. The problem with this, of course, is that the introduction of evidence of a person's character for the purpose of proving "action and conformity therewith" is prohibited. Fed.R.Evid. 404(b). Just as a defendant charged with robbing Bank A may not have admitted against him evidence that he may have attempted to rob Bank B, I believe the defendant in this case should not have had introduced against him evidence that he may have defrauded patients not listed in the indictment.

The extrinsic offense evidence admitted here for the alleged purpose of showing intent is nothing more than an elaborate cloak behind which bad character evidence may be slyly admitted. The evidence admitted here in the name of intent is relevant only to the extent that it creates an inference that the defendant has a propensity for defrauding and mistreating patients. It does not have any independent relevance on the question of the defendant's intent. The danger that has manifested itself here is one inherent in most bootstrapping efforts. By looking to extrinsic offenses, prosecutors will be able to reinforce otherwise unprovable charged offenses by way of inferences generated from acts themselves not provable.

We must be vigilant in our watch over the values secured by Rule 404(b), which assures criminal defendants that they will be fairly tried on the basis of their actions alleged in the indictment. Due process demands no less.

Accordingly, I must respectfully dissent.