853 F.2d 927
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Mario MLINARIC, Plaintiff-Appellant,
v.
PARKER HANNIFIN CORPORATION, Defendant-Appellee.
 No. 87-3112.
 United States Court of Appeals, Sixth Circuit.
 Aug. 5, 1988.
 
 Before KEITH and ALAN E. NORRIS, Circuit Judges and GEORGE E. WOODS, District Judge.*
 Opinion for the Court filed by District Judge Woods:
 Plaintiff-appellant Mario Mlinaric appeals the orders of the District Court (1) bifurcating plaintiff's age and national origin discrimination claims; (2) dismissing plaintiff's retaliation claims; (3) directing a verdict in favor of defendant-appellee Parker Hannifin Corporation on plaintiff's age discrimination claim; and (4) granting judgment in favor of defendant on plaintiff's national origin discrimination claim. We affirm each order of the District Court.
 Plaintiff was born in Italy in 1936, at a time in which Italy occupied a present-day Yugoslavian area known as Crotia. He moved to Rome at the age of seven, remaining there until he immigrated to this country in 1956.
 Several months after his arrival, plaintiff settled in Cleveland and began working for Z & W Corporation. Defendant acquired Z & W Corporation in the 1960's. Plaintiff thereafter advanced in skill and wage rates. By 1974, plaintiff attained a Machine Builder and Repair "A" position, one of the top paid positions for hourly workers. Plaintiff continued to work at the Eastlake, Ohio plant until November of 1981, when defendant began to phase out the plant. As a result of the phase-out, defendant transferred plaintiff and many other Eastlake employees to its plant in Wickliffe, Ohio.
 The transfer of the Wickliffe employees to the Eastlake plant took place in accordance with a collective bargaining agreement (CBA) between defendant and plaintiff's union. Under Article VII of the CBA, plaintiff and other transferred employees could use their superior seniority to "bump" less senior employees "provided they had the skill and ability to perform the work involved."
 Defendant's Wickliffe management held several meetings with hourly employees and the union in an effort to facilitate the transfer of Eastlake employees into Wickliffe and to improve the morale of affected Wickliffe employees. By January of 1982, approximately 230 personnel moves had occurred. To minimize the changes, defendant and the union agreed to interpret the "skill and ability to perform" bumping prerequisite as requiring a bumping employee to have the ability to "walk up and do" the desired job. Plaintiff testified and introduced other evidence that the "skill and ability" standard was the sole requirement for bumping; the majority of evidence indicated, however, that defendant and the union applied the "walk up and do" standard. For example, a former union representative admitted that the union filed a grievance on behalf of an employee to force the defendant to adhere to the "walk up and do" standard.
 Prior to transferring, plaintiff and other Eastlake employees were informed as to possible positions into which they could bump. Plaintiff's seniority and job experience enabled him to bump into almost any job in the Wickliffe plant. Defendant advised all employees to consider bumping into lesser job classifications if they were unsure of their ability to "walk up and do" a particular job. An employee unable to do a particular job would be "disqualified." Disqualification meant demotion to the least senior available job in the plant. Plaintiff elected to bump into the Machine Builder and Repairman (All Around) job, a position with a job description identical to the Machine Builder and Repair "A" position plaintiff held at the Eastlake plant. The Eastlake plant, however, did not contain the automatic equipment present in the Wickliffe plant. Automatic equipment constituted the overwhelming majority of the primary production and repair work at Wickliffe. Plaintiff nevertheless assured John Minarich, the Wickliffe plant manager, that plaintiff could perform the job.
 Soon after plaintiff's transfer, Minarich and John Dorsey, plaintiff's immediate supervisor, found that plaintiff was not satisfactorily performing his job. Although plaintiff experienced difficulty making some of the repairs, his main difficulty was that he was too slow in repairing the machines. Minarich advised Dorsey to keep notes documenting plaintiff's performance. Several of defendant's managers, from approximately December of 1981 to January of 1982, warned plaintiff that he was in danger of being disqualified. Defendant's managers provided plaintiff with parts books and manuals, while continuing to monitor plaintiff's performance.
 A factor that could have affected plaintiff's ability to efficiently perform repairs was plaintiff's excessive use of valium. On cross-examination, plaintiff admitted that he needed valium to help control his hypertension, but took more valium than his three times a day prescription. Plaintiff stated that he took additional valium because of his asthma condition and his difficulty sleeping at night. He also admitted to taking the medication while at work.
 In February of 1982, after plaintiff had worked on the machine builder-repairer job for ten weeks, defendant disqualified plaintiff. Plaintiff filed a grievance to overturn the disqualification. During the grievance procedure, the union contended that plaintiff was discriminated against and harassed, as shown by the scrutiny of plaintiff by his foreman and the lack of assistance he received from his foreman and fellow workers. Defendant, on the other hand, contended that plaintiff was given a fair sampling of repair work, but failed to perform in a "workmanlike" manner. Defendant and the union subsequently agreed that plaintiff would be reinstated and given a second chance to perform the job.
 Once again, notes were kept of plaintiff's performance. After three weeks on the job, plaintiff's performance remained substandard, in defendant's view, resulting in a second disqualification. The union again grieved plaintiff's disqualification, raising the same arguments as before. Defendant contended that plaintiff's performance remained substandard despite the instruction he was given on machine assemblies and the help he received from co-workers. This time, however, the grievance was not resolved. The union had the option of taking plaintiff's unresolved grievance to a strike vote, but declined to do so. As a result, plaintiff was disqualified and placed in his present hourly position at defendant's Wickliffe plant.
 Plaintiff filed suit in February of 1984. Prior to trial, defendant moved to bifurcate issues of liability from damages, as well as the non-jury claim (Title VII claim based on national origin) from the jury claims (age discrimination and pendent state claims). The district court denied bifurcation of damages and liability, but granted bifurcation of the jury and non-jury claims. The court also declined to exercise pendent jurisdiction over the state law claims. Thus, at the time of trial, the age discrimination claim remained to be tried to a jury, and the national origin discrimination claim remained to be tried before the court.
 After five days of trial before the jury on plaintiff's age discrimination claim, the district court granted a directed verdict in favor of defendant at the close of plaintiff's case. Trial before the court immediately commenced and continued for five additional days on the national origin discrimination claim. The district court thereafter issued a written decision in favor of defendant on the national origin claim.
 1. BIFURCATION
 Plaintiff contends that the district court erred in bifurcating his age and national origin discrimination claims. Plaintiff asserts that bifurcation was inappropriate due to the overlap of facts and issues in the two claims. He also believes that bifurcation hindered the ability of his witnesses in the national origin claim to respond to defendant's questions on cross-examination. We disagree.
 F.R.Civ.P. 42(b) provides as follows:
 (b) Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.
 Plaintiff was not entitled to receive, and made no request for, a jury trial on his national origin discrimination claim, which he brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. Harris v. Richards Manufacturing Co., 675 F.2d 811 (6th Cir.1982). Plaintiff timely demanded a jury trial on his age discrimination claim.
 The Federal Rules of Civil Procedure clearly contemplate separate trials of jury and non-jury issues. The Notes of the Advisory Committee to Rule 39 state that "[w]hen certain of the issues are to be tried by jury and others by the court, the court may determine the sequence in which such issues shall be tried. See Liberty Oil Co. v. Condon Nat. Bank, 260 U.S. 235, 43 S.Ct. 118, 67 L.Ed. 232 (1922)." This language at one time was contained in a draft of the rules, but was removed since "the power is adequately given to Rule 42(b)." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 513 n. 3 (1959) (Stewart, J., dissenting).
 
 
 1
 The decision of whether to try issues separately rests within a trial court's sound discretion. An abuse of discretion will be found only where a reviewing court is left with a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Yung v. Raymark Indus., Inc., 789 F.2d 397, 400 (6th Cir.1986). As Rule 42(b) indicates, relevant factors include the potential prejudice to the parties, potential confusion to the jury, and the relative convenience and economy that would result from separate trials. In re Beverly Hills Fire Litigation, 695 F.2d 207, 216 (6th Cir.1982), cert. denied sub nom. Bryant Electric Co. v. Kiser, 461 U.S. 929 (1983).
 
 
 2
 Contrary to plaintiff's assertions, we see little overlap of facts that would justify presenting evidence applicable to a (non-jury) national origin discrimination claim to a jury charged with considering an age discrimination claim. We do not believe that the shifting burden of proof requirement, see Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981), applicable to both claims, cf. Kitchen v. Chippewa Valley Schools, 825 F.2d 1004, 1010-12 (6th Cir.1987), required a joint trial of both claims.
 
 
 3
 Nor do we find that plaintiff was prejudiced by the separate trials. Plaintiff asserts that defense counsel, during the age discrimination claim, was unfairly able to cross-examine plaintiff and one of plaintiff's witnesses regarding an Equal Employment Opportunity Commission (EEOC) proceeding. Plaintiff contends that he and his witness could not fully answer because a complete answer to defense counsel's questions would have required an explanation of the EEOC's investigation of his national origin discrimination claim. Nevertheless, the prejudice to plaintiff, even if it occurred, was far outweighed by the likely prejudice to defendant in jointly trying the two claims. The national origin claim under Title VII was a much stronger claim than the age discrimination claim and the district court did not abuse its discretion in concluding that the jury would confuse the evidence offered on each claim. Moreover, all of the alleged incidents of name calling, burning, harassment, etc., were offered to support the national origin claim. Hearing such evidence could have prejudiced the jury's consideration of the age discrimination claim. The district court, in our view, adopted the least prejudicial approach in trying the two claims separately.
 
 2. RETALIATION CLAIM
 
 4
 On March 26, 1982, plaintiff filed a charge with the EEOC, alleging that he had been laid off on February 2, 1982 because of his national origin, Crotian, and age, forty-six. On December 29, 1983, the EEOC issued plaintiff a Notice of Right to Sue on both claims. Plaintiff's EEOC charge and the EEOC's subsequent investigation made no mention of defendant's alleged retaliation.
 
 
 5
 On May 17, 1984, plaintiff filed a complaint with the Ohio Civil Rights Commission, again raising claims of national origin and age discrimination arising from the February 2, 1982 layoff. This complaint, which did not mention retaliation, was dismissed as untimely.
 
 
 6
 Plaintiff first referred to retaliation in his complaint and supplemental complaint filed with the district court. The district court permitted plaintiff to introduce evidence concerning retaliation which allegedly occurred in 1984 and 1986, after plaintiff had returned to work in July of 1984 following a two-year injury layoff. Plaintiff testified that defendant failed to accommodate his work limitations caused by his knee and back injuries. At the close of the jury trial, the district court dismissed plaintiff's retaliation claim, concluding that plaintiff should have presented the claim to the EEOC. Plaintiff argues that the retaliation claim did not have to be raised in the EEOC proceeding since the claim was reasonably expected to grow from the EEOC charge.
 
 
 7
 In Tipler v. E.I. duPont de Nemours & Co., 443 F.2d 125, 131 (6th Cir.1971), this Court held that a party's complaint in a judicial proceeding is limited only "to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." The scope of the investigation is broadly construed because discrimination charges filed with the EEOC often are brought by lay persons "unfamiliar with the niceties of pleading and are acting without the assistance of counsel." Id. Courts generally find that claims of retaliation reasonably can be expected to grow out of a discrimination charge and permit such claims to be brought by an individual without prior resort to the EEOC. E.g., Gupta v. East Texas State Univ., 654 F.2d 411 (5th Cir. Unit A 1981).
 
 
 8
 The difficulty with applying the above standards to the instant case is that plaintiff's retaliation claims arise from events completely unrelated to his earlier EEOC claims. The EEOC charge and Ohio Civil Rights complaint concern alleged national origin and age discrimination claims arising from plaintiff's February 2, 1982 layoff. The retaliation claim, on the other hand, concerns events occurring in 1984 and 1986 after plaintiff returned to work from a two-year layoff. Plaintiff's retaliation claim arose well after the termination of the EEOC investigation and the issuance of the right to sue notice and could not be "reasonably expected to grow out of" the discrimination charges. Under these circumstances, the district court did not err in concluding that it lacked subject matter jurisdiction over plaintiff's retaliation claim because plaintiff failed to file that charge with the EEOC.
 
 3. AGE DISCRIMINATION
 
 9
 Plaintiff next claims that the district court erred in directing a verdict in favor of defendant on his claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 621 et seq. A directed verdict is appropriate when the evidence is such that reasonable minds could reach but one conclusion as to the proper verdict. Gomez v. Great Lakes Steel Division, National Steel Corp., 803 F.2d 250, 254 (6th Cir.1986). In making that determination, a court may not pass on the credibility of witnesses, but must view all evidence in the light most favorable to the unmoving party, drawing all reasonable inferences in that party's favor. Id.
 
 
 10
 Applying literally the four criteria of McDonnell Douglas v. Green, 411 U.S. 792 (1973), to the ADEA claim requires plaintiff to show that he was
 
 
 11
 (1) a member of a protected class (age 40 to 70);
 
 
 12
 (2) subjected to adverse employment action;
 
 
 13
 (3) qualified for the position; and
 
 
 14
 (4) replaced by a younger person.
 
 
 15
 Simpson v. Midland-Ross Corp., 823 F.2d 937, 940 (6th Cir.1987). Once plaintiff establishes a prima facie case of age discrimination, the burden of production shifts to the defendant employer to provide a legitimate nondiscriminatory reason for the adverse employment action. Id. (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)). Should the employer articulate a legitimate reason for its employment action, the plaintiff has the burden of showing that the stated reason is merely pretextual or a cover-up for what in truth was a discriminatory purpose. Ridenour v. Lawson Co., 791 F.2d 52, 56 (6th Cir.1986); Wilkins v. Eaton Corp., 790 F.2d 515, 521 (6th Cir.1986). In evaluating such claims, this court consistently has eschewed a blind, mechanistic application of the McDonnell Douglas criteria, see Simpson, 823 F.2d at 940-41 (citing cases), preferring instead a case-by-case approach that recognizes the realities of the business world. Laugesen v. Anaconda Co., 510 F.2d 307, 312 (6th Cir.1975).
 
 
 16
 It is clear that plaintiff (1) was 46 years of age and within the class of persons protected under the ADEA; (2) held a machine builder-repairer position for several years prior to his transfer and had performed well; (3) was disqualified from a job; and (4) was replaced by a 29 year-old man with lesser seniority and experience. Although that would appear to establish a prima facie case, two additional facts must be noted. First, plaintiff was replaced by a 29 year-old employee, not by defendant's choosing, but by operation of the CBA. Second, plaintiff made little showing that he was qualified for the Wickliffe position. As noted above, plaintiff's experiences at Eastlake did not involve automatic machines and did not equip him to "walk up and do" the repairs needed at Wickliffe.
 
 
 17
 As an alternative to the McDonnell Douglas criteria, a plaintiff can prove discrimination through statistical or other direct evidence. Simpson, 823 F.2d at 940. Plaintiff claims that "statistically" the maintenance department was aging and that defendant's managers, during contract negotiations with the union, expressed concerns regarding the high cost of employee benefits for the older workers. The difficulty with accepting plaintiff's statistical showing, however, is that seven of the twelve employees in the maintenance department were older than plaintiff. None of the older employees reported discrimination. Moreover, plaintiff was approximately five years younger than the average age in the department. Defendant would have laid off or fired one or more of its older employees had it truly wished to lower costs. Finally, defendant did not significantly lower its costs since plaintiff was disqualified, not discharged. Plaintiff's salary was reduced a mere thirty-two cents an hour.
 
 
 18
 The only direct evidence of alleged age discrimination offered by plaintiff is the showing that several of defendant's managers formed friendships with some of the younger employees. The evidence of friendships with the younger employees, however, fell far short of supporting an inference that age entered into the defendant's decision to disqualify plaintiff. We hold, therefore, that the district court did not err in granting a directed verdict in favor of defendant on plaintiff's age discrimination claim.
 
 4. NATIONAL ORIGIN
 
 19
 Plaintiff finally argues that the district court erred in entering judgment for defendant on the national origin discrimination claim. Plaintiff disagrees with the district court's findings of fact, believing that he proved by a preponderance of the evidence that he was subjected to a hostile working environment due to his national origin.
 
 
 20
 A district court's factual findings cannot be set aside unless they are found to be clearly erroneous. F.R.Civ.P. 52(a). Factual findings are clearly erroneous when, although they are supported by evidence, a reviewing court after review of all the evidence "is left with the definite and firm conviction that a mistake has been committed." Rabidue v. Osceola Refining Co., 805 F.2d 611, 616 (6th Cir.1986) (citing Anderson v. Bessemer City, 470 U.S. 564 (1985)), cert. denied, 107 S.Ct. 1983 (1987). Moreover, under Rule 52 a reviewing court must give even greater deference to a district court's findings when they are based on determinations of credibility. 805 F.2d at 616 (citing Anderson, 470 U.S. at 575).
 
 
 21
 Title VII prohibits all forms of discrimination in employment based on race, color, religion, sex, or national origin. 42 U.S.C. Sec. 2000e-2(a). An employer violates Title VII when it creates or tolerates a "hostile working environment" that is "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group members." Erebia v. Chrysler Plastic Products Corp., 772 F.2d 1250, 1254 (6th Cir.1985) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir.1971), cert. denied, 406 U.S. 957 (1972)), cert. denied, 475 U.S. 1015 (1986); Torres v. County of Oakland, 758 F.2d 147, 152 (6th Cir.1985) (national origin discrimination claim based on hostile working environment). To be actionable, the incidents of national origin slurs must be more than occasional or sporadic. Id. It must also be shown that the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take reasonable steps to remedy the situation. Erebia, 772 F.2d at 1254; cf. Rabidue, 805 F.2d at 621 (sex discrimination claim based on hostile working environment).
 
 
 22
 The testimony of plaintiff and his witnesses differed sharply from the testimony of defendant's witnesses with respect to each of the alleged incidents of national origin discrimination. Plaintiff testified that he was the victim of harassment and name calling on an almost hourly basis by other maintenance department employees. He stated that they referred to him as "DP Mario,"[1] and frequently scribbled that name on the door of his locker and on the walls in the men's lavatory. During lunch periods, a couple of the maintenance department employees would often laugh at plaintiff and "spit right in front of him." (R. 586) Plaintiff also mentioned one occasion in which his tools were scattered on the floor of the maintenance department. Several of the tools were never located and he believes they were stolen. Plaintiff also mentioned the deliberate and malicious burning of his workbench. Plaintiff further testified that he was not given assistance by defendant's maintenance department managers, nor was he provided with manuals to enable him to complete repairs. On several occasions when he successfully repaired a machine, the machine would be sabotaged by other employees, who would then falsely blame plaintiff for failing to make a proper repair.
 
 
 23
 Defendant's witnesses, in contrast, testified that the incidents of name calling directed toward plaintiff were isolated incidents, which consisted of mere locker-room conversation and humor. They stated that plaintiff was not subject to such abuse on an hourly or even daily basis. To the extent such hostility occurred, it resulted from the co-workers' dislike of plaintiff, their belief that plaintiff was unable to perform his job, and their concern that plaintiff and other employees from Eastlake would assume the jobs held by Wickliffe employees. Moreover, the worker who scattered plaintiff's tools testified that he was reprimanded for his actions and never again engaged in such activity. Defendant's managers also investigated the burning of plaintiff's workbench. They discovered that the workbench accidentally burned when an employee on a later shift used the bench for welding and inadvertently burned the cardboard top of the bench.
 
 
 24
 Defendant's witnesses also stated that the manuals plaintiff requested were always available. They believed that the jobs on which plaintiff requested assistance were one-man jobs. Although defendant's management could have given plaintiff greater assistance in learning to repair automatic machines, the management had to comply with the "walk up and do" requirement derived from the CBA. Defendant's witnesses further testified that plaintiff's disqualification on both occasions resulted from his deficient and untimely repairs.
 
 
 25
 In short, there is insufficient evidence that defendant's management tolerated or failed to correct a work situation that was so heavily polluted with national origin discrimination so as to affect plaintiff's emotional and psychological stability. There was no evidence that defendant's management ever referred to plaintiff's national origin or used his national origin as a reason for either disqualification. As a result, we find no error in the district court's factual findings and affirm the judgment for defendant on the national origin discrimination claim.
 
 
 26
 For the foregoing reasons, the district court's judgment is hereby AFFIRMED.
 
 
 27
 KEITH, Circuit Judge, concurring in part and dissenting in part.
 
 
 28
 KEITH, Circuit Judge, concurring in part and dissenting in part:
 
 
 29
 I concur with the portion of the majority opinion which finds no merit in Mr. Mlinaric's bifurcation, age discrimination or retaliation claims. However, I must dissent with respect to the national origin claim. After review of the facts, I can come to no other conclusion than that the district court was clearly erroneous in determining that there was not sufficient evidence to establish discrimination on the basis of national origin.
 
 
 30
 To say that the facts of this case are compelling is an understatement. Mr. Mlinaric testified that he was constantly harassed and threatened. He was persistently insulted with the ethnic slur "DP," initials which stand either for "displaced person" or "dumb Polack." "DP" was shouted at him and written on his locker. During a union election, an employee passed out hats that said "Don't vote for DP Mario." He was incessantly called a "DP son-of-a-bitch"; co-workers said "DP Mario doesn't know anything," and "if that DP comes back I'm quitting." Mlinaric was bombarded with comments such as, "they're going to ship you back," and "they're going to put you back on the first boat." He was also repeatedly called a "fucking DP." Perhaps most indicative of the atmosphere of the plant was the drawing in the men's restroom of a stick figure with a wrench and a noose around his neck: the words "Good-bye DP Mario" were scrawled alongside. The plant manager testified that "Fuck all DPs" was also written on a stall in the men's room.
 
 
 31
 Mr. Mlinaric's fellow employees spit at him. He testified that they refused to assist him, refused to give him manuals so that he could learn more about his machine, and refused to eat with him. Graffiti was scrawled on his locker; it was broken into, and items were stolen. His workbench was set afire and irreparably scorched. He claims that his replacement workbench was covered with garbage each morning. His tools were strewn around the floor. Mr. Mlinaric reported the harassment to his superiors, who did nothing.
 
 
 32
 I am unsure just how much more harassment, short of physical brutality, that the district court would have required before it was satisfied that Mr. Mlinaric was discriminated against on the basis of his national origin. To me, it is abundantly clear that the pervasive atmosphere of endless, cruel harassment contaminated and blackened the workplace environment. I am left only with the "definite and firm conviction that a mistake has been committed" by the court below. Anderson v. Bessemer City, 470 U.S. 564 (1985).
 
 
 33
 The district court ruled that the employees' hostility toward Mr. Mlinaric was traceable not to national origin, but instead to a general hostility and concern over their own jobs. While this is an understandable fear, it should not translate into attacks laced with slurs referring to national origin. I fail to understand what the name-calling, the drawing of plaintiff with a noose around his neck, the graffiti and persistent use of "DP" were, if not attacks based upon national origin. In my opinion, the plant's management was under an obligation to aggressively intervene to stop this endless harassment of Mr. Mlinaric, and to mute the hostile environment at the plant.
 
 
 34
 The district court dismissed the national origin claims because the testimony was conflicting, stating that defendant's witnesses, while admitting to some level of harassment, adequately explained the insults away as "mere shop talk," and the graffiti as "minimal." Similarly, the majority appears to believe that the incidents of name calling were "mere locker room conversation and humor," thereby suggesting that Mr. Mlinaric should "lighten up" and learn how to take a joke. But, just as degrading references to Jews, blacks or women negatively impact the psychological health of those groups, ethnic "jokes" are similarly debilitating to the peoples targeted by them. A work environment that encourages and condones such treatment of diverse peoples quashes productivity and potential, and fosters low self-esteem. Moreover, the continual use of ethnic slurs couched "in fun" insidiously but effectively perpetuates the sorry and ridiculous stereotype of Eastern Europeans as a slow and stupid people. That some would want to build themselves up by callously degrading others is not surprising. What is surprising, however, is the majority's implicit acceptance of the idea that slurs against a class of people, if said as a "joke," sufficiently erases the taint of discrimination.
 
 
 35
 I therefore conclude that evidence of the hostile environment in which Mr. Mlinaric worked was sufficient to meet his Title VII claim. For the above reasons, I respectfully dissent and would reverse as to Mr. Mlinaric's national origin claim.
 
 
 
 *
 The Honorable George E. Woods, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 "DP" was an acronym for the term "displaced person," an apparent reference to an individual's immigration into the United States