# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 27, 2012

# STATE OF TENNESSEE v. JEFFREY SCOTT GOLD

### Appeal from the Criminal Court for Sullivan County
### No. S57082     R. Jerry Beck, Judge

### No. E2012-00387-CCA-R3-CD - Filed August 15, 2013

A Sullivan County jury convicted the Defendant-Appellant, Jeffrey Scott Gold, of aggravated child abuse and aggravated child neglect, Class A felonies, for which he received concurrent terms of twenty-two-years' imprisonment. On appeal, he argues that the trial court erred in (1) granting the State's motion to depose a prospective witness to preserve that witness's testimony for trial; (2) denying his motion for judgment of acquittal as to the aggravated child neglect conviction; and (3) imposing an excessive sentence. Following a thorough review, we reverse and vacate the aggravated child neglect conviction. In regard to the other issues, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Stephen M. Wallace, District Public Defender; Andrew J. Gibbons, Assistant Public Defender, Blountville, Tennessee, for the Defendant-Appellant, Jeffrey Scott Gold.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Barry P. Staubus,  District Attorney General; and William B. Harper, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On October 19, 2008, C.G.,[1] Gold's forty-three-day-old son and the victim in this case, was taken to the hospital due to "unusual" irritability. Once at the hospital, medical personnel observed bruises on the victim's nose, mouth, chest, back, left leg, and groin area. Further examination revealed that the victim's injuries were the result of non-accidental trauma. Gold later admitted that, while holding the victim in his arms, he tripped down several stairs and fell on top of the victim with the full weight of his body. Gold insisted that the injuries to the victim were accidental. On September 22, 2009, Gold was charged by grand jury presentment with aggravated child abuse and aggravated child neglect of the victim. The following proof was adduced at trial.

**Trial.** Shannon Evans, the victim's mother and Gold's ex-girlfriend, testified that the victim was born in September 2008. He was delivered vaginally without the use of forceps. She said the victim was born with a hydrocele, which she described as a swollen area on the left side of his scrotum. Prior to the victim's birth, in August 2008, Evans moved to a home that Gold purchased for them and became financially dependent upon Gold. After describing their relationship at length, Evans said that she and the victim usually went to bed at 7:00 p.m., that the victim slept in a bassinet in the same bedroom, and that Gold "never [went] to bed with [them]."

Evans described the victim as a "perfectly healthy, happy child" and did not observe the victim exhibiting any signs of pain or discomfort from October 1, 2008 through October 18, 2008. She denied having a car accident on the trip to visit her parents on October 18, 2008, and she said that she never let the victim out of her sight while with her parents. When she changed the victim's diaper during the trip, she did not observe any injuries and noticed that the hydrocele had improved. During her visit with her family, she never saw anyone injure the victim. After visiting with her family, Evans returned to Gold's house on October 18, 2008, around 10:30 p.m.

Evans testified that when they arrived home, Gold took the victim out of the car and Evans and the victim went to bed shortly thereafter. Around 2:30 a.m., Evans awoke to feed the victim and returned to sleep after Gold volunteered to feed and change the victim. Evans said she awoke a second time around 7:00 a.m. because the victim was fussy and crying. Gold was consoling the victim by patting him on his back, and Evans fell asleep. She woke a third time between 10:30 a.m. and 11:00 a.m. because she heard the victim crying "like never before." She said that Gold was rocking the victim and that she asked him what had happened. Gold never explained why the victim was crying and "made [her] feel like it was

---

[1] This court refers to victims who are minors by their initials only.

just a . . . bellyache." She saw some blood on the victim's nose and asked Gold what had happened. At that point, Gold "got very defensive" and told her "something about a mobile." Evans asked Gold if they should take the victim to the emergency room, and he refused, stating, "[T]hat a dime of [the cost] wasn't coming out of his pocket. That . . . he wasn't going to take him." Evans explained that she "let it go" because she was scared and trusted Gold.

Around noon on October 19, 2008, Gold's mother and stepfather, Frank and Judy Kibler, arrived at Gold's house. The victim was still crying, and they attempted to console him. Evans testified that Gold's parents initially believed the victim had a stomachache and went to the store to purchase gas drops. Later that same day, Evans stood behind Gold as he changed the victim's diaper. Evans said she noticed that the victim's scrotum was red and appeared different from what she had previously observed. When she questioned Gold about the victim's groin area, he explained that "he probably put [the victim's] diaper on too tight." A couple of hours later, Gold was in the guest bedroom changing the victim's diaper when Evans noticed a small bruise on the victim's back. When she asked Gold about the bruise, Gold became upset with her. He told Evans that he did not know what had happened and that he "didn't intentionally hurt [the victim] or anything like that." Evans then pushed Gold, and he pushed her back.

Evans showed Gold's mother the victim's bruise later that evening. Gold's mother told Evans to take the victim to the emergency room. Evans said that Gold told her to "leave his name out of it" and that "Social Services . . . will come . . . and . . . do something." Evans testified that Gold had exclusive care of the victim from the time she returned to his house on October 18, 2008, to October 19, 2008. She said that she never hurt the victim and that Gold never gave her an explanation of what happened to the victim. She acknowledged that she gave several different statements to authorities and explained that she did so because she "was very upset and devastated." After taking the victim to the hospital, Evans and Gold lost custody of the victim, and Evans moved out of Gold's house. By agreement, the Kiblers received legal guardianship of the victim, and Evans had visitation on the weekends. Evans was not charged with a crime in connection with the injuries to the victim and was not promised anything in exchange for her testimony at trial.

On cross-examination, Evans acknowledged that Gold purchased a house and remodeled it so she and the victim could live with him. She also acknowledged that Gold and his family were at the hospital for the victim's birth and that Gold was happy about the birth of his son. She said that Gold never exhibited violent behavior toward her or the victim and that she had no reason to distrust Gold with the victim. She also said that Gold helped her with the victim on weekends and that it was not unusual for Gold to offer to feed the victim so she could rest. Evans asserted that she added additional information to her subsequent police statements because she remembered more details each time she provided

a statement.  She believed that the injuries to the victim were accidental because Gold was incapable of intentionally hurting him.

Evans said that the victim did not suffer brain damage, was not crippled or deformed, and was a healthy, happy, active three-year-old child.  She acknowledged that in October 2008, John Freeman of Department of Child Services (DCS) told her that she and Gold could be charged with abuse.  She also acknowledged that she told police that she may have caused some of the injuries to the victim's back on October 18, 2008, by changing the victim's diaper in her sister's car where the seatbelt buckles could have bruised him.

On redirect-examination, Evans testified that on either October 9, 2008, or October 10, 2008, she heard the victim crying while she was in a bedroom in Gold's house and while Gold was in the den with the victim.  Gold told her the victim's diaper had fallen off, and he bent down to get it.  He told her that as he bent down, the victim fell out of his arms and hit a wooden table.  Evans later observed makeup on the victim's face to conceal this injury, and she asked Gold about it.  Evans said that Gold admitted that he put makeup on the victim's face because he did not want her to be upset with him because he had dropped the victim.

Each of the victim's family members who were present during the October 18, 2008 visit to his grandparent's home the day before he was taken to the hospital testified at trial.  The victim's maternal grandmother testified that the victim had no visible injuries when he arrived at her home on October 18, 2008.  She observed her daughter change the victim's diaper in the car and saw no evidence of injury to the victim.  She testified that neither she nor her daughter injured the victim.  She also stated that the victim was not fussy or irritable when he left her home.  On cross-examination, she testified that she visited the victim about once a week at Gold's house and that the victim always appeared to be a healthy, happy baby.  She did not recall whether she had seen the victim the week before October 18, 2008.  The victim's maternal grandfather testified, in large part, consistently with the testimony of his wife and daughter.  He denied injuring the victim and did not observe anyone else injure him.  The maternal aunt of the victim testified consistently with the other family members present on October 18, 2008.  She also denied injuring the victim and identified photographs taken of him that day.  On cross-examination, she said that she probably had seen the victim only twice before October 18, 2008.

Harold Lance DeBord, a physician assistant at Northeast Tennessee Emergency Physicians, testified that he was working in the Holston Valley Hospital emergency room when the victim arrived on October 19, 2008.  He stated that his physician encounter notes regarding the victim, which were admitted as an exhibit, indicated that the victim was "brought in for crying, constipation, . . . as well as testicular swelling."  DeBord observed bruising on the victim's back, the side of his trunk, his groin area, and arm, all of which he documented on the physician encounter diagram.

-4-

Sergeant Chris Tincher of the Kingsport Police Department identified nineteen photographs taken of the victim on October 20, 2008, while the victim was at Holston Valley Medical Center. Based on the photographs, Sergeant Tincher observed that the victim had a "little, small red mark right . . . at the bridge of his nose"; three bruises on his back, which were approximately one inch, an inch and a half, and three inches long; a bruise on his leg; bruising on the right side of the groin area of the leg and a swollen scrotum sac; and "a pumpknot," or raised area, on the top of the child's head.

Teresa Brooks, a Child Protective Services (CPS) investigator for DCS, testified that on October 20, 2008, she encountered Gold and Shannon Evans as they sat together in the lobby area of the Kingsport Police Department. Brooks did not identify herself to Gold or Evans and overheard a conversation between them. Brooks specifically heard Gold tell Evans that if he was asked how the bruise on the genital area occurred, he was going to say that he "wiped him too hard." Brooks also heard Gold say, "if any inquiry was made into any of the other bruises, he was going to say that he just plays with him too rough." Brooks said that Evans "just seemed to nod her head and agree."

Rachel Buckles, the victim's CPS case manager, testified that she was also sitting in the Kingsport Police Department lobby area on October 20, 2008. She also overheard a conversation between Gold and Evans. Buckles testified she heard Gold say that "if they asked about the bruising to [the victim's] genitals, [he] would just say that he had wiped him too hard. Or if they asked about the bruising on the rest of [the victim's] body, they would just say that Mr. Gold maybe had been playing with him too rough. And M[s]. Evans would say, 'Yes, you know, we'll–okay, we'll say that.'" Buckles testified that Gold "appeared to be calm, cool, collected" when talking about their plans, but he "became agitated" when talking about his previous interactions with CPS Investigator Casey Gibson.

Over defense counsel's objection, a video deposition of Dr. Amirah Daher was entered as an exhibit at trial and played for the jury. Dr. Daher, an expert in the field of pediatric intensive care, testified that she was a pediatric intensivist with Holston Medical Group in Kingsport, Tennessee. She obtained the victim's medical history from Dr. Fisher, the physician who admitted the victim to the hospital from the emergency room. She said that the victim "was brought into the emergency room with the chief complaint [that he was] extremely fussy and irritable for the day . . . and [that] he was not acting [like] his usual self." She testified that the victim arrived with bruises on his nose, mouth, chest, back, groin area, and left leg. She testified that the parents did not mention anything about the bruises; however, the emergency room staff noticed the bruises. She said that neither she nor Dr. Fisher were "able to elicit any explanation on how [the injuries] happened."

Dr. Daher testified that the CT scans and MRIs performed on the victim revealed "two skull fractures on the right and on the left and [] several bleedings within the brain called

subarachnoid hemorrhages." She said that this type of hemorrhaging is the result of great force or the skull coming into "direct contact with a solid surface" like a floor or wall or from "something like a baseball bat" hitting the skull with "a fair amount of force." The fracture to the left leg was a spiral fracture, which she said was caused by "two opposing forces," similar to when someone holds the leg in both hands and twists. She said the victim had rib fractures on the back of the second and eighth right ribs, which were also caused by extreme force. Although she agreed that CPR could have caused the fracture on the eighth rib, she said that it was "extremely unlikely." She explained that typically, if CPR caused a fracture, then the clavicle would also be fractured. She said that the victim did not have a fractured clavicle and that there was "nothing in [the victim's] history to indicate that a CPR was done." Because the victim's injuries were all over his body, Dr. Daher opined that they were not caused by a single accidental event. Finally, she agreed that it was fair to characterize the victim's injuries as non-accidental.

On cross-examination, Dr. Daher admitted that she had very limited contact with the victim's mother and no contact with Gold. She agreed that Dr. Fisher had communicated his suspicion of child abuse to her before she saw the victim's scans and X-rays. She confirmed that Dr. Fisher was a pediatrician and that Dr. Neal was the emergency room physician who saw the victim and noted her suspicion of non-accidental trauma in his chart. She observed the victim on October 20, 21, 22, and 23, 2008. She was unable to determine exactly when the skull fractures occurred but opined that they were a "couple of days" old. While she agreed that a 200-pound man falling to the ground would generate quite a bit of force, she denied that it could have caused the victim's injuries due to the pattern of injuries on the victim's body.

Dr. Marianne Neal, a pediatric radiologist at the Johnson City Medical Center, testified as an expert in the field of pediatric radiology. She reviewed the victim's head CT, skeletal survey, brain MRI, bone scan, and chest X-rays, all of which were admitted as an exhibit at trial. The victim's birth records from Johnston Memorial Hospital were also admitted as an exhibit. Dr. Neal testified that the head CT showed a skull fracture on the left side of the brain and "bleeding on both sides of the brain, both in the subdural space and the subarachnoid space, which are different layers of the brain." She also found a calcified area on the left side of the skull, which she "considered [to be] a birth injury." Dr. Neal said that the skeletal survey showed "a left lower leg fracture," and the CT of the abdomen and pelvis showed "a healing right eight rib fracture."

Dr. Neal estimated that the victim's brain hemorrhage was less than ten days of age. She said that it was "very difficult" to determine when the skull fractures occurred; however, the presence of soft tissue swelling indicated that they were less than two weeks old. She further explained that the leg fractures or spiral fractures showed no signs of healing, which indicated they were less than seven days old. Dr. Neal said that spiral fractures are caused

by significant force and cannot be caused by a fall. She also noted that the victim had posterior rib fractures, which she considered suspicious because the victim was a non-ambulating infant with no history of severe trauma.

Based on the November 6, 2008 follow-up chest X-ray, Dr. Neal identified six fractures to the back side of the victim's ribs. She stated that at the time of this X-ray the rib fractures were healing, and she estimated that the fractures occurred between seven and fifteen days prior to the X-ray. She believed that the type of fractures revealed by the X-ray were highly suspicious because they were caused by shaking or squeezing the victim. She explained that "[r]ib fractures are very, very rare in infants and children. . . . because of the plasticity or the bendability of the thoracic cage. It can bend with heavy weights on it and not break because of the bendability." She added that such fractures are rarely seen "[e]ven in high-speed motor vehicle collisions." Finally, Dr. Neal stated within a reasonable degree of medical certainty that the victim's injuries resulted from non-accidental trauma. She confirmed that movement of a child's fractured leg would cause pain and that the act of moving or grabbing the chest of a child with a fractured rib would cause pain. She forwarded her report and review of the X-rays and CT scans of the victim's injuries to CPS Case Investigator Buckles in two different letters, both of which were admitted as exhibits.

On cross-examination, Dr. Neal acknowledged that an adult falling on top of a child could cause rib injuries. She also acknowledged that she never observed or treated the victim. On redirect-examination, Dr. Neal testified that DCS asked her to examine the X-rays. She did not believe that all of the victim's injuries were caused by a single traumatic event. She said that the rib fractures showed "different states of healing" and that the bleeding in the brain appeared to be less than three days old. She testified that the spiral leg fracture resulted from twisting, not a fall, and for "a non-ambulating infant, there is no accidental explanation." On recross-examination, Dr. Neal agreed that the spiral fracture could have been caused by the lower part of the leg being pinned down while the upper portion of the body was turned.

Frank Kibler, Gold's stepfather, testified that prior to the instant offense, he and his wife saw the victim about three times a week and kept the victim overnight a couple of times. He changed the victim's diapers and never saw any injuries before October 19, 2008. Kibler said that he never saw Gold violent, angry, or resentful toward the victim and that Gold was a loving father who was "thrilled to have . . . the child." He confirmed that on October 19, 2008, he and his wife visited the victim at Gold's house and tried to determine the source of the victim's fussiness. He said the victim was "very calm" while he walked with him around Gold's house before he and his wife left. He said that the victim was normal in every way and had no lasting effects as a result of the injuries from October 2008. On cross-examination, Kibler said that when he saw the victim at Gold's house October 19, 2008, he

thought the victim was in discomfort, not pain, and he did not notice any markings or bruises on his face.

Judy Kibler, Gold's mother, testified that prior to the offense she saw the victim about three times a week and that the victim sometimes slept overnight at her home. She said that Gold was excited about the victim and "was reveling in all of his accomplishments, however minor they were." She testified that Gold never expressed anything other than pride and love for the victim, that she never saw anger or resentment in Gold, and that she never saw Gold handle the victim in anger. She confirmed that on October 19, 2008, she observed the victim at Gold's home. She said that the victim was "unusually fussy" and "was whimpering, and he had his hands clinched kind of tight to him. . . . He just looked very uncomfortable." She initially believed that the victim had gas pressure and purchased some Mylicon drops for him. She and her husband held the victim but did not change his diaper and did not observe any injuries. She said that they showed Gold and Evans how to administer the Mylicon drops, and the victim "seemed to get a little bit more comfortable."

Mrs. Kibler said that when she returned to Gold's house that evening, the victim was "still fussy, still uncomfortable, not normal for someone who might have had a little bit of gas." She explained that, considering the victim's age, she believed "somebody professional [should] look at him." She said that when she was pulling the victim out of the car, Evans told her the victim had a bruise on his back, but she did not understand the significance of that statement. Gold and Mr. Kibler came to the hospital later, and Gold and Evans stayed in the hospital with the victim until they were told to leave. She never observed Gold engage in abusive behavior toward the victim.

On cross-examination, Mrs. Kibler acknowledged that the victim was prescribed pain medicine and wore a cast until November 4, 2008. She agreed that she kept the victim on the Friday morning prior to his hospitalization, that she changed his diaper, and that there were no visible injuries at that time. She acknowledged that she later observed bruising on the victim's face in the photograph of him taken at the hospital, but explained that she did not notice it at Gold's house October 19, 2008.

Jeffrey Scott Gold, the Defendant-Appellant, testified that he met Evans in 2007 and began dating her "off and on." After some time, Gold accepted Evans's unexpected pregnancy and prepared to be a father to his first child. He purchased and remodeled a new house. He said he had feelings for Evans and asked her to move in with him because he "wouldn't know if [he] didn't give it a shot." He agreed that for the sake of his son he wanted to give his relationship with Evans a chance to grow.

Gold testified that in mid-October 2008, while feeding the victim a bottle, he dropped the bottle, reached for it, and bumped the victim's head on a table. It left a mark but not a

visible bruise. He denied putting makeup on the victim's face and said that he put baby powder on it because he had been told that "it was good for a baby's skin." He told Evans what happened and did not observe any signs of distress or pain from the victim. Gold said that he loved the victim "more than anything."

Gold confirmed that Evans took the victim to visit her family and returned home with the victim on October 18, 2008, around 9:30 p.m. or 10:30 p.m., and Evans and the victim went to bed. Gold went to sleep around midnight on the couch and awoke to the victim's cries. He said he got the victim out of his bassinet and held him. Between 2:30 and 3:00 a.m., Gold went downstairs in his basement to change out the laundry. With the victim in his arms, Gold slipped and fell on the hardwood floors. In doing so, Gold "fell on top of [the victim]; but went down to the first, second, and third of the stairs; but caught him. I had him embraced within me. And it happened so quick[ly,] and I was scared to death." He said the victim was in his left arm and, as he pulled the victim to him, the full weight of his body landed on the victim. Immediately after the fall, he examined the victim "from head to toe" and observed that the victim had a nose bleed and red marks on his back. He did not observe any bruises. He tried to comfort the victim, but the victim remained fussy through the morning. He said he did not tell Evans about the fall because he was scared, did not want her to worry, and was afraid of making himself "look bad as a father." He was also fearful that he would lose custody of his son. Finally, Gold believed that the victim was "okay."

Gold acknowledged that Evans asked to take the victim to the emergency room, but he said that she "never really . . . pushed it." He also acknowledged that when Evans asked him about the victim's bruises, he became defensive. He said that he and Evans had never physically confronted one another until that day, when Evans pushed him, and he pushed her back. Gold said he did not tell his mother about the fall because he "was worried about myself, what people would think of me, and [I] was not putting [the victim] first, and I should have. . . . I definitely regret that." He admitted telling Evans that he would not pay for the victim to go to the hospital but explained that "[i]t was just a dispute; just mixed emotions at the time." He said that he would have taken care of the victim financially because he had insurance.

Gold confirmed that his mother told him to take the victim to the hospital. He said that he told her not to take the victim to the hospital because he knew of a friend who lost custody of his child when the child was taken to the hospital after an accident. When Gold was informed of the extent of the victim's injuries, he went to the hospital and stayed with Evans and the victim until he was told to leave. Gold denied intentionally hurting the victim or abusing the victim in any way. He agreed that he omitted from his statement to the police that he had fallen down the stairs and landed on top of the victim. He explained that he was "scared to death" and believed that he would lose custody of the victim. He said that he "own[ed] up to" the bad decisions he made after the tragic accident.

On cross-examination, Gold viewed exhibit fourteen, a photograph of the victim taken at the hospital. The photograph showed the victim with intravenous tubes inserted in his body and a cast on his left leg. After viewing the photograph, Gold agreed that the victim appeared to be in extreme pain. Gold said that the bruises on the victim's back came from his hand gripping him during the fall. He said that he was six feet two inches tall and that the impact was "three to four feet high off the ground." Gold acknowledged that he was dishonest with police officers and that he should have told them the truth. Gold said that, other than his mother, he did not tell anyone about the fall until the trial.

Based on the above proof, the jury convicted Gold as charged. After a sentencing hearing, the trial court enhanced Gold's sentence based upon the victim's vulnerability because of his age and found that it "deserve[d] more weight" than the applicable "catch-all" mitigating factor. The trial court imposed a concurrent term of twenty-two-years' and imposed a $50,000 fine for each conviction. Gold timely filed motion for new trial, which the court denied. He then filed a timely notice of appeal.

## ANALYSIS

**I. Motion to Allow Deposition.** Gold contends that the trial court erred "in granting the State's request for depositions of Dr. Amirah Daher and in releasing Dr. Daher from her subpoena." Gold argues that because Dr. Daher had been properly served with a subpoena, she was not unavailable under Rule 15(h)(1)(E) of the Tennessee Rules of Criminal Procedure. He also argues that the State's inconvenience of paying to transport Dr. Daher from Saudi Arabia to testify at trial does not rise to the level of an exceptional circumstance. In response, the State contends that Gold has waived this issue by failing to challenge on appeal the admission of the deposition at trial. Alternatively, the State argues that the trial court properly allowed Dr. Daher's deposition and that Gold has failed to show the admission of the deposition at trial prejudiced him.

The decision whether to grant or deny a motion to take the deposition of a proposed witness for use at a criminal trial is committed to the discretion of the trial court and should be exercised carefully. United States v. Mann, 590 F.2d 361, 365 (1st Cir.1978); see also United States v. Campbell, 845 F.2d 1374, 1378 (6th Cir.1988) (applying an abuse of discretion standard of review to trial court's determination of exceptional circumstances in support of video deposition). Tennessee Rule of Criminal Procedure 15(a) states that "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial" and that the trial court may "grant the motion because of exceptional circumstances and in the interest of justice[.]" Tenn. R. Crim. P. 15(a). In addition, Tennessee Rule of Criminal Procedure 15(f) outlines the situations in which a deposition can be admitted as substantive evidence:

(1) <u>In General.</u> At the trial or in any hearing, a party may use a part or all of a deposition–otherwise admissible under the Tennessee Rules of Evidence–as substantive evidence if:
(A) the witness is unavailable as defined in Rule 15(h); or
(B) on motion and notice, the court–in the interest of justice with due regard to the importance of presenting the testimony of witnesses orally in open court–finds such exceptional circumstances exist that make it desirable to allow the deposition to be used.

Tenn. R. Crim. P. 15(f); <u>see</u> <u>State v. Singleton</u>, 853 S.W.2d 490, 493 (Tenn. 1993) ("Rule 15 of the Tennessee Rules of Criminal Procedure narrowly restricts the availability of depositions in criminal cases, reserving their use to 'exceptional circumstances,' when the 'interest of justice' requires that a deposition be taken to preserve the testimony of a prospective witness who is unlikely to be able to testify at trial."). A witness is considered unavailable under Rule 15(h) where the witness:

(A) is exempted by court ruling on the ground of privilege from testifying concerning the subject matter of the declarant's statement;
(B) persists in refusing to testify concerning the subject matter of the declarant's statement despite a court order to do so;
(C) demonstrates a lack of memory of the subject matter of the declarant's statement;
(D) is unable to be present or to testify at the hearing because of the declarant's death or then existing physical or mental illness or infirmity; or
(E) is absent from the hearing and the party seeking to introduce the declarant's statement has been unable to procure the declarant's attendance by process or other reasonable means.

Tenn. R. Crim. P. 15(h).

The Advisory Commission Comment to Rule 15 cautions that "depositions are not meant to function as discovery devices in criminal cases" and that "[t]heir taking is meant to be tightly confined to those exceptional cases where the interests of justice require the taking for the preservation of testimony for use at trial, and not for discovery." Tenn. R. Crim. P. 15, Advisory Comm'n Comment. Moreover, the burden is on the moving party to demonstrate that exceptional circumstances exist warranting the taking of a deposition to preserve a witness's testimony for trial or the admission of the witness's deposition as substantive evidence at trial. With the exception of section (f)(1), Rule 15 is modeled after its federal counterpart. <u>See</u> <u>id.</u> However, unlike the federal rule, Tennessee has no formal test to determine whether exceptional circumstances exist warranting the use of a deposition as substantive evidence at trial. <u>Compare</u> <u>U.S. v. Philip Driscoll</u>, No. 1:05-CR-103, 2006

WL 2883382, at *3 (E.D. Tenn. October 10, 2006) (reiterating that the factors for determining whether a trial court should allow the taking of a deposition pursuant to Federal Rule of Criminal Procedure 15 are "whether (1) the witness is <u>unavailable</u> to testify at trial; (2) injustice will result because testimony <u>material</u> to the movant's case will be absent; and (3) <u>countervailing factors</u> render taking the deposition unjust to the nonmoving party").[2]

Although Gold does not challenge the taking of or the admissibility of the deposition on constitutional grounds, this Court has previously stated:

> [A]ny interpretation of Tenn. R. Crim. P. 15 must be made against the backdrop of constitutional protections that inhere in the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article 1, Section 9 of the Tennessee Constitution. It is against this backdrop that the Advisory Commission Comments to Tenn. R. Crim. P. 15 record the Commission's intent "that depositions be taken only in those cases wherein their use is clearly necessary, and that their taking not be authorized in other cases."

State v. Coulter, 67 S.W.3d 3, 59 (Tenn. Crim. App. 2001), <u>disagreed with on other grounds</u> by State v. Jackson, 173 S.W.3d 401, 407 (Tenn. 2005). In other words, a "deposition is a weak substitute for live testimony, a substitute that the Sixth Amendment does not countenance on a routine basis." Stoner v. Sowders, 997 F.2d 209, 213 (6th Cir. 1993).

On March 22, 2011, the State filed a motion to depose Dr. Daher, a prospective witness in Gold's trial. During the hearing on the motion, neither party offered any proof. The State advised the trial court that Dr. Daher would be unavailable to testify at Gold's trial because she was "moving permanently to Saudi Arabia" on May 15, 2011. Gold's trial was scheduled for September 2011. The State requested permission from the trial court to conduct a video deposition of Dr. Daher's testimony. Because Dr. Daher had been served with a subpoena to testify at the trial, defense counsel objected to the video deposition. The State advised the trial court that it would incur "considerable expense" if it brought Dr. Daher back from Saudi Arabia for the trial and that Dr. Daher was a necessary witness because she treated the victim. Based on this information, the trial court determined that exceptional circumstances existed warranting a video deposition to preserve Dr. Daher's testimony for trial. The court noted that "if this [Dr. Daher] gets to Saudi Arabia, my writ doesn't run in Saudi Arabia. I don't know if there's even any international treaties that might exist to bring [her] back." The trial court ordered Gold, his attorney, and the State's attorney to appear in court to participate in the video deposition of the physician.

---

[2] Neither party advocates for the adoption of a formal test to determine exceptional circumstances and in the interest of justice under Rule 15; therefore, we decline to address that issue in this appeal.

-12-

On May 11, 2011, the State deposed Dr. Daher in the presence of the trial judge, defense counsel, and Gold. Defense counsel renewed his objection to the video deposition, which the trial court overruled.

At trial, Gold renewed his objections "to the taking of the depositions and . . .to using a video deposition at trial." Additionally, in his motion for new trial, Gold contested the trial court's order granting the State's request to depose Dr. Daher. However, in his appellate brief to this court, Gold challenges only the trial court's order granting the State permission to depose Dr. Daher and not the use of or admission of the deposition at trial. Accordingly, we conclude that Gold has properly preserved for our review only the issue of whether the trial court properly granted the State's motion to depose Dr. Daher. See Tenn. R. App. P. 27(a)(4) ("The brief of the appellant shall contain . . . [a] statement of the issues presented for review[.]"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Gold correctly notes that Dr. Daher was not unavailable under the circumstances outlined in Rule 15(h). However, the trial court's decision to allow the State to take the video deposition of Dr. Daher was not based on her unavailability for the trial. Instead, the trial court determined that Dr. Daher's impending permanent relocation to Saudi Arabia constituted an exceptional circumstance under Rule 15 warranting the preservation of her testimony by video deposition. Gold further argues that the "inconvenience to the State does not rise to the level of an exceptional circumstance." Here, we are compelled to note that there was no proof offered at the hearing to establish whether exceptional circumstances existed to support taking Dr. Dahir's deposition. Neither party explored the circumstances of Dr. Daher's impending departure. There were no questions posed to Dr. Daher concerning whether she could return voluntarily to the United States, whether she could delay her relocation until after the trial, or whether she would experience any personal hardship if required to delay her plans or return to the United States. Moreover, the State offered only conclusory statements regarding the expense it would incur if required to pay for the return of Dr. Daher.

We acknowledge that the trial court granted the State's motion based, in large part, on its belief that it did not have legal authority to require Dr. Dahir to return to the United States. While this may indeed be true, this court requires more than conclusory statements to establish whether exceptional circumstances and the interest of justice demands a Rule 15 deposition. Nevertheless, upon our review of the record, we fail to see and Gold has failed to demonstrate any prejudice as a result of the State taking Dr. Dahir's deposition.

Additionally, in light of our concerns under the Confrontation Clause, the record shows that the trial court properly notified the parties of the impending video deposition.

-13-

Gold, his attorney, and the State's attorney participated in the deposition, and defense counsel was able to conduct a full cross-examination of Dr. Daher at that time. Accordingly, the taking and admission of Dr. Daher's deposition did not violate Gold's rights under the Confrontation Clause. Upon our review, we conclude that the trial court did not err in granting the State's motion to depose Dr. Daher and that Gold has failed to show any prejudice resulting from the admission of Dr. Daher's video deposition as substantive evidence at trial. See State v. Simon, 635 S.W.2d 498, 504 (Tenn. 1982) (holding that the admission of a deposition of an eyewitness who was in the military and required to leave the state prior to trial did not violate Rule 15); see also United States v. Johnson, 752 F.2d 206, 210 (6th Cir. 1985) (holding that a witness's ability to be present at trial does not prevent the taking of a deposition under Rule 15 of the Federal Rules of Criminal Procedure). He is not entitled to relief on this issue.

**II. Denial of Motion for Judgment of Acquittal**. Gold argues that the trial court erred in denying his motion for judgment of acquittal on count two, aggravated child neglect, because the proof showed that the victim "was taken to the emergency room and began receiving treatment on the same day as the alleged abuse," and that "[t]here was no evidence introduced to show that [Gold's] actions or inactions after the injuries occurred affected the victim's health and welfare." In response, the State contends that the evidence was sufficient to support Gold's conviction for aggravated child neglect because the proof showed that "due to efforts of [Gold] to prevent his son from receiving medical treatment, the child experienced extreme physical pain that could have been alleviated with proper medical care."

"The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction[.]" State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). Because a motion for judgment of acquittal is a question of law, the trial court is permitted only to review the legal sufficiency of the evidence rather than the weight of the evidence. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)).

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states,

"Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Here, Gold challenges the evidence supporting count two of the presentment, which charged him with aggravated child neglect. In order to sustain a conviction of aggravated child neglect the State was required to prove that Gold committed the offense of child neglect or endangerment which resulted in serious bodily injury to the child. T.C.A. § 39-15-402(a) (Supp. 2008). Code section 39-15-401(b) defines child neglect or endangerment as "knowingly abus[ing] or neglect[ing] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare[.]" Id. § 39-15-401(b) (Supp. 2008). At the time of his offense, serious bodily injury was defined as bodily injury involving a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Id. § 39-11-106(34) (Supp. 2008).

Gold relies upon State v. Mateyko, 53 S.W.3d 666 (Tenn. 2001) and State v. Wanda Elaine Brock, No. E2009-00785-CCA-R3-CD, 2011 WL 900053 (Tenn. Crim. App. Mar. 16, 2011), to support his argument that the trial court erred in denying his motion for judgment of acquittal on the aggravated child neglect charge. In Mateyko, the Tennessee Supreme Court held that "before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." 53 S.W.3d at 671-72. Additionally, in Wanda Elaine Brock, this court held that "where a defendant is convicted of both aggravated child abuse and aggravated child neglect . . . there must exist some evidence that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse." 2011 WL 900053, at *5; Compare State v. Marcos Acosta

-15-

Raymundo, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207, at *15 (Tenn. Crim. App. Nov. 10, 2010) (concluding that the defendant's delay in seeking help for the victim until she collapsed did not have an actual, deleterious effect on her health because the victim's collapse was caused by the abuse, not the delay), and State v. John Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *11 (Tenn. Crim. App. Apr. 26, 2010) (holding the evidence failed to demonstrate that the defendant's delay in seeking medical care for the victim caused additional brain damage when medical experts testified generally to the risk of continued swelling of the brain but the evidence failed to show an actual, deleterious effect on the victim caused by the delay), and State v. Denise Wiggins, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *5 (Tenn. Crim. App. Nov. 2, 2007) (holding that the burn from an iron, rather than the defendant's failure to seek medical help, caused the child's serious bodily injury), and State v. Vernita Freeman, No. W2005-02904-CCA-R3-CD, 2007 WL 426710, at *8, n.1 (Tenn. Crim. App. Feb. 6, 2007) (vacating the aggravated child neglect conviction, despite medical testimony that the victim might have survived had she received prompt medical attention, because the proof failed to show that the act of neglect caused the serious bodily injury), with State v. Christopher Earl Watts, No. M2009-02570-CCA-R3-CD, 2012 WL 1591730, at *19 (Tenn. Crim. App. May 3, 2012), perm. app. denied (Tenn. Sept. 21, 2012) (concluding that the evidence was sufficient to support the defendant's conviction for aggravated child neglect when the defendant failed to seek medical attention for the victim until he stopped breathing, which resulted in the victim's permanent brain injury), and State v. Lakeisha Margaret Watkins, No. M2009-02607-CCA-R3-CD, 2011 WL 2682173, at *25 (Tenn. Crim. App. July 8, 2011) (affirming the conviction for aggravated child neglect when the defendant's failure to seek medical attention until after victim stopped breathing caused injury to his brain from the lack of oxygen and the defendant's "failure to seek medical treatment after the first seizure posed a substantial risk of death").

Relying on State v. Kathryn Lee Adler, No. W2001-00951-CCA-R3-CD, 2002 WL 1482704, at *5 (Tenn. Crim. App. Feb. 19, 2002), the State insists that the elements of aggravated child neglect were met because the victim experienced extreme physical pain due to Gold's failure to seek prompt medical treatment. In our view, Kathryn Lee Adler is distinguishable from Gold's case because the evidence in that case showed that the defendant's failure to seek medical care increased the victim's risk of serious bodily injury. In that case, Adler's husband sought medical attention for the victim following the victim's seizure, which was nearly seventy-two hours after the initial abuse. Id. at *1. The physicians testified that the victim had "'very, very extremely burned areas'" on fifteen percent of his body that were "'extremely painful,'" and that "the failure to seek prompt medical attention placed the victim at a substantial risk of serous bodily injury or death." Id. at *2.

Here, the record is devoid of any proof concerning what effect, if any, Gold's failure to seek prompt medical care had on the victim's injuries. See Denise Wiggins, 2007 WL

3254716, at *5 (noting that "[w]hile the question of whether the Appellant sought medical treatment is relevant to [whether the defendant knowingly neglected the child] . . . , it is not dispositive of the second element required for conviction," which is whether the neglect resulted in serious bodily injury to the child). There was also no proof that the victim suffered any injury after the initial act of abuse. Given the above authority, we are unable to conclude that Gold's failure to seek medical treatment resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse. See id. at *5. Therefore, we reverse and vacate the judgment of conviction for aggravated child neglect.

**III. Sentencing.** Gold contends that the trial court imposed an excessive sentence. Specifically, he insists that his sentence of twenty-two years is greater than that deserved for this single criminal incident. He also argues that the trial court failed to give sufficient weight to the "catch-all" mitigating factor and requests this Court to conduct a "de novo review and correct this injustice." In response, the State contends that the 2005 amendments to the Sentencing Act of 1989 deleted as grounds for appeal a claim that the trial court improperly weighed enhancement and mitigating factors and that State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012), abrogated the de novo standard of review. Regardless, the State contends that the trial court did not err in imposing the twenty-two-year sentence. We agree with the State.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (Supp. 2008). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d) (Supp. 2008), Sentencing Comm'n Comments.

Because of the broad discretion given to trial courts by the 2005 amendments to the sentencing act, "sentences should be upheld so long as the statutory purposes and principles,

along with any applicable enhancement and mitigating factors, have been properly addressed." Bise, 380 S.W.3d at 706. Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

At the November 21, 2011 sentencing hearing, the parties agreed that Gold had no prior criminal record and was a Range I, standard offender convicted of two Class A felonies, which carried a sentencing range of fifteen to twenty-five years. The State entered Gold's presentence report as an exhibit. The report showed that the victim was Gold's only child, and while on bond, Gold received medication for a depressive disorder and general anxiety disorder. The court rejected the State's request to apply as an enhancement factor Gold's military reprimand, which did not involve a court martial or conviction.

Several witnesses testified on Gold's behalf. David Anderson testified that he met Gold after the offense occurred, allowed Gold to be with his young children regularly, made Gold the godparent of his one-year-old, and considered the offense out of character for Gold. He recommended Gold at his workplace and testified to his stellar job performance. A letter from Gold's employer, admitted into evidence, stated that Gold "would be eligible for rehire." On cross-examination, Anderson acknowledged that he had a felony conviction regarding a counterfeit controlled substance.

Laurey Conway, a family friend, testified that she had known Gold since he was a year old and that Gold had helped her raise her son. She said dishonesty was not consistent with Gold's character.

Gold's stepfather, Frank Kibler, testified that Gold was a hard worker and a "good kid." He said that he was proud to have Gold as his stepson. He did not believe Gold intentionally harmed the victim. He stated that he and his wife had permanent custody of the victim, who was a healthy, happy child with no permanent injuries, disfigurements, or brain damage. Gold's mother, Judy Kibler, testified that she thought Gold was "scared out of his mind" when the victim was injured and that Gold's behavior was inconsistent with his normal behavior. She asked the court for mercy on behalf of her son.

Gold, age thirty, testified that he graduated from high school and attended some college classes while in the Army. He received commendations and an honorable discharge

-18-

from the Army after receiving a service-related injury to his left palm. He received disability from the Army and worked until he was incarcerated. He had no criminal or juvenile court record. He acknowledged that he had made mistakes and had accepted responsibility for them. He read a prepared statement in which he professed his love for his son, the victim, and apologized to him, his friends, and family. He said that he had jobs waiting on him in Tennessee and Arkansas, which would enable him to pay his fines.

The trial court considered the "catch-all" mitigating factor and determined that it was outweighed by the victim's vulnerability because of his age. See T.C.A. § 40-35-113(13), -114(4) (Supp. 2008). It then imposed concurrent twenty-two year sentences, which were within the sentencing range, and imposed $50,000 fines for each conviction. Although we have reversed and vacated Gold's conviction for aggravated child neglect, the trial court's oral findings show that the trial court carefully considered the evidence, the applicable enhancement and mitigating factors, and the purposes and principles of sentencing before sentencing Gold. Therefore, Gold has failed to show that the trial court abused its discretion in imposing the sentence in this case. He is not entitled to relief.

## CONCLUSION

Upon our review, we conclude that the trial court did not err in allowing the State to depose Dr. Daher to preserve her testimony for trial and that the trial court did not abuse its discretion in imposing the sentence in this case. However, because we conclude that there was no proof showing that Gold's failure to seek prompt medical attention following the victim's injuries resulted in serious bodily harm to the victim, we reverse and vacate the aggravated child neglect conviction and remand this matter to the trial court for entry of an amended judgment consistent with this opinion. We affirm the aggravated child abuse conviction and sentence.

_____
CAMILLE R. MCMULLEN, JUDGE